(No. 68977.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN PASCH, Appellant.

*Opinion filed October 1, 1992.—Rehearing denied November 30, 1992.*

MILLER, C.J., and FREEMAN, J., concurring.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, and Susan Frisk, law student, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, John Pasch, was charged with two counts of murder and one count of aggravated kidnapping in Cook County. Following a jury trial, defendant was found guilty of the murders of Leslie Shearer and Officer Richard Clark, as well as the aggravated kidnapping of Jean Wiwatowski. After finding defendant eligible for the death penalty based on three statutory aggravating factors, the jury found there were insufficient mitigating factors to preclude imposition of the death sentence. Therefore, defendant was sentenced to death, as well as to a 15-year term of imprisonment for the aggravated kidnapping conviction. The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

Concerning pretrial procedures, defendant raises as issues whether: (1) the trial court erred in not granting a hearing to determine if promises to defendant, made during the negotiations leading up to his surrender,

should be specifically enforced; (2) a *Batson* hearing is required, as the State peremptorily challenged the only Hispanic venireperson; and (3) defendant's right to an impartial jury had been violated when the trial court refused to excuse for cause three jurors.

Pertaining to the guilt phase of the trial, defendant raises as issues whether: (1) the insanity and the guilty but mentally ill (GBMI) instructions violated due process with their conflicting burdens of proof which might have resulted in the jury's rejecting a GBMI verdict; (2) the GBMI instructions violated due process by failing to place the burden of proof upon the State; (3) defendant's right of confrontation was violated when the State referred to nontestifying experts' opinions during the direct examination of its expert and the cross-examination of defendant's experts; (4) the impeachment of defendant's expert with the conclusions of other experts upon which he did not rely was proper; (5) due process was violated when defendant was forced to give tape recordings of his interview with his expert to the State when he was not allowed to tape-record his interview with the State's expert; (6) the opening and closing statements were inflammatory and denied defendant his right to a fair trial; (7) the cross-examination of a defense witness, Brian Kelly, violated defendant's right of confrontation; (8) defendant was proven guilty beyond a reasonable doubt of aggravated kidnapping; (9) the stricken testimony of Officer Walsh concerning his telephone conversation with defendant upon arrival requires reversal; and (10) the trial court erred in sustaining the State's objection to the question asked of Officer Biebel about what defendant said had caused him to shoot the two people.

Concerning his sentencing hearing, defendant raises as issues whether: (1) the introduction of victim impact evidence denied defendant his eighth amendment right to a fair trial and sentencing; (2) the mitigating evidence

precluded the death sentence; (3) the State's argument at sentencing denied defendant due process and the right to a fair sentencing hearing under the eighth and fourteenth amendments; (4) it was proven beyond a reasonable doubt that defendant knew or should have known that Officer Clark had been a peace officer; (5) due process was abridged by Officer Walsh's testimony in the first phase that defendant told him over the phone that he "had material to make gasoline bombs, he had armor-piercing ammunition, and he wanted to kill more policemen"; and (6) the GBMI instruction was reasonably likely to cause the sentencer to disregard defendant's mitigating evidence of his mental state.

Concerning the constitutionality of the Illinois death penalty statute, the defendant raises as issues whether: (1) the statute unconstitutionally places the burden upon a defendant to prove mitigating circumstances; and (2) the death penalty statute results in the arbitrary imposition of the death penalty.

The facts of this case are as follows. Defendant was visited by his landlord, Leslie Shearer. During the visit, defendant had a heated conversation with Shearer, then chased him into the yard and shot him several times, killing him. Immediately thereafter, defendant ran next door and struggled with an older woman, Mary Wagner, on the porch of an apartment building that she shared with her sister, Jean Wiwatowski. Wagner was able to escape, but then defendant ran into her apartment carrying weapons. After fleeing, Wagner proceeded to tell a neighbor what had transpired, and that her sister was still in the house with defendant.

Shortly thereafter, police arrived in response to a call indicating that shots had been fired and that a man had been shot. Three officers walked down the street, taking shelter behind parked cars. Defendant shouted that no one should come into the house and then shortly thereaf-

ter shot and killed a plainclothes officer, Richard Clark, after which a long standoff ensued.

During the standoff, a full hostage program was put into effect, with the immediate area sealed off, while negotiators talked to defendant. A hostage negotiator recalled making promises to defendant, but does not remember any promises made about the death penalty. Another negotiator stated that defendant brought up the death penalty, but that the negotiator had changed the subject. Both negotiators opined that defendant knew what he was doing. The entire standoff lasted approximately 36 hours, at the conclusion of which defendant and the police agreed on how defendant would surrender. He was then arrested.

At trial, the insanity defense was raised. Defendant presented several photos of his apartment which showed it to be in complete disarray. Several neighbors stated that defendant had been a recluse. Defendant's friend, Al Fleck, stated that, since 1981, the defendant had been "hanging out" with transvestites. The defendant's expert, Dr. Gaspero, a clinical psychologist, stated that, in his opinion, defendant suffered from moderate to severe depression, obsessive compulsive thoughts, and an avoidant personality disorder; that defendant took refuge in his apartment due to his delusions that the world was a threat, delusions which arose from a beating he suffered at the hands of a gang of Hispanic youths a year earlier; that his estranged son's 30th birthday, which occurred on the same day as the shootings, was not a mere coincidence, but was a contributing factor; and that defendant was insane at the time of the shootings. Another neighbor, who lived in the same apartment building as defendant, stated that in the weeks prior, he had heard defendant arguing with himself, repeatedly turning the water on and off, and breathing in an amplified and unusual manner.

The State's expert, Dr. Cavanaugh, a psychiatrist, stated that defendant suffered from mild to moderate depression; that defendant had schizoid personality traits; that defendant had been suffering from a mental illness, dysthymia; that defendant was mildly paranoid; that defendant's condition did not rise to the level of a personality disorder; that defendant's mental condition did not meet the legal definitions of insanity or guilty but mentally ill; that the other State experts who examined defendant did not agree with Dr. Gaspero's opinions; and that neither defendant's choice of friends, his divorce, his obesity, his filthy apartment, nor the attack by the Hispanic street gang affected his sanity.

After the jury found defendant guilty of the murders of Shearer and Clark, as well as the aggravated kidnapping of Wiwatowski, the trial proceeded to the sentencing hearing. In the first phase of sentencing, the jury found defendant eligible for death since (1) he had killed two people; (2) one of the persons he had killed was a police officer; and (3) one of the victims had been killed in the course of a felony (*i.e.*, aggravated kidnapping).

In the second phase of the hearing, all of the evidence and testimony from trial was allowed to be used. Defendant's estranged son testified that he had not seen his father in nearly 20 years; that it was significant that the shootings took place on his birthday; and that his father needs help and should not be executed.

Additional relevant facts will be forthcoming as each individual issue is discussed in depth.

## PRETRIAL ISSUES

Before trial, the defense filed a motion requesting the specific performance of promises made to defendant during the hostage standoff. According to defendant, the negotiators promised him that if he surrendered, he would not have the death penalty imposed against him,

that he would be taken to a mental hospital, and that he would be afforded a lawyer. The State filed a motion to strike, dismiss and deny defendant's motion for specific performance. Subsequently, the defense requested an evidentiary hearing to establish the factual allegations in the motion for specific performance. This request was denied. The court also dismissed the original motion as untimely, even though it had apparently been filed prior to the cut-off date established by the court. Notwithstanding the timeliness problem, the court ruled that the promises given were made under duress, and were therefore not enforceable.

Defendant alleges that the court erred in failing to grant defendant a hearing on this motion. He submits that there was a question over exactly what was promised him; therefore a hearing should have been granted to resolve any conflict that existed. As support for his position that promises not to seek the death penalty are enforceable, defendant relies on *People v. Walker* (1981), 84 Ill. 2d 512, and *People v. Brownell* (1983), 96 Ill. 2d 167.

We find that *Walker* and *Brownell* are not controlling in this instance. An analysis of those cases reveals that in each the State's Attorney's office had entered into a plea bargain with the defendant to the effect that the State's Attorney would not seek the death sentence in return for a concession from the defendant (*e.g.*, a guilty plea or a written confession). This differs substantially from the situation at hand, where, according to defendant, the police promised him that they would refrain from seeking the death penalty if he would surrender.

It is clear that defendant did not enter into a plea bargain with the State when the police promised him that they would not seek the death penalty if he would surrender. Defendant never said during the negotiations that he would plead guilty to the charges, and the prose-

cutor never accepted a plea in exchange for a lesser sentence than death, nor did defendant ever actually plead guilty to the charges against him. It is only where a defendant enters a guilty plea in reliance upon the promises of a prosecutor that he is entitled to a remedy when such promises are breached. *Santobello v. New York* (1971), 404 U.S. 257, 262, 30 L. Ed. 2d 427, 433, 92 S. Ct. 495, 499.

More importantly, defendant's claim that such promises were enforceable disregards the fact that he was legally required to give up his hostage and surrender; thus, any promises made to induce him to do what he already was legally obligated to do would not constitute an even exchange of promises as required for the existence of a plea bargain. Additionally, any promises which were made to defendant during this period of time were void from the very beginning and unenforceable as a matter of public policy, as they were made through violence and coercion. See *State v. Rollins* (1976), 116 R.I. 528, 359 A.2d 315.

A trial court's decision to hold an evidentiary hearing is discretionary, and such a decision will not be reversed absent an abuse of such discretion. (*People v. Adams* (1987), 164 Ill. App. 3d 742, 747.) Here, there was clearly no abuse of discretion in denying defendant an evidentiary hearing where the trial court found as a matter of law that he was not entitled to one. The court specifically found that sufficient evidence of the promises made to defendant had been presented through various defense and prosecution motions. Moreover, the State never contested the existence of promises, only that whatever promises were made were unenforceable (for the reasons previously discussed). Thus, there was clearly no need for an evidentiary hearing.

Defendant, a Caucasian, next contends that his equal protection rights were violated because the State chal-

lenged the only apparently Hispanic venireperson and the court did not require the prosecutor to explain the basis of his challenge. The State, on the other hand, maintains that defendant has waived appellate consideration of this issue by failing to compile an adequate record which would indicate the race or ethnic origin of all the venirepersons.

In order to provide for meaningful appellate review of a *Batson* issue, the record should disclose the race of the venirepersons. (*People v. McDonald* (1988), 125 Ill. 2d 182, 194-95.) However, the absence of such information will not overcome strong evidence weighing in favor of a *prima facie* case. (*People v. Andrews* (1992), 146 Ill. 2d 413, 434-35.) Consequently, we shall review the relevant facts of *voir dire* and the *Batson* claim as they appear from the trial court record.

Equal protection is denied where a defendant is put on trial before a jury from which prospective jurors have been purposely excluded because of their race. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) "*Batson* established a two-step procedure for the resolution of a defendant's claim that the prosecution used its peremptory challenges in a racially discriminatory manner. First, the defendant must establish a *prima facie* case of purposeful discrimination in the selection of his jury. Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging each of the venirepersons. [Citation.] The trial court must then consider those explanations and determine if the defendant has established purposeful discrimination." *Andrews*, 146 Ill. 2d at 424, citing *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.

For a *prima facie* showing, the defendant must establish that the relevant circumstances surrounding the selection of the jury raise an inference of racial discrimi-

nation by the State. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.) Here, defendant claims that there was a *prima facie* showing of racial discrimination under *Batson*, as Mexican-Americans are a clearly identifiable class under equal protection analysis. *Castaneda v. Partida* (1977), 430 U.S. 482, 495, 51 L. Ed. 2d 498, 511, 97 S. Ct. 1272, 1280; see also *Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859.

A number of factors are relevant in determining whether a *prima facie* case of discriminatory jury selection has been established. These factors include:

"a 'pattern' of strikes against [Hispanic] jurors; 'the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges' [citation]; the disproportionate use of peremptory challenges against [Hispanics] [citations]; the level of [Hispanic] representation in the venire as compared to the jury [citations]; whether the excluded [Hispanics] were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and victim [citations]; and the race of the witnesses [citations]." *People v. Evans* (1988), 125 Ill. 2d 50, 63-64.

The trial judge in the case at bar never made a finding as to whether a *prima facie* case had been established by the defendant. The only discussion found in the record with regard to defendant's *Batson* claim is as follows:

"MR. SMITH [Defense Counsel]: Your Honor, regarding one of the last jurors excused, Mr. Maldadado [*sic*], we'd like the record to reflect Mr. Maldadado [*sic*] was called in chambers. He was asked date of birth and social security number. The purpose for that, the State believed that he was a possible felon.

MR. SCHOLZ [Defense Counsel]: Correct.

MR. SMITH: He was then excused. We object. The only Latin.

THE COURT: He was excused on peremptory.

MR. SMITH: We are just making a record. We object to him being excused. He was apparently of Hispanic descent. Mexico.

MR. SCHOLZ: Mr. Pasch indicates that Dr. Cavena [sic] took profuse notes during the interview.

THE COURT: We will—if he has them, we will get them. Order of Court 10-20.

MR. McNERNY [Prosecutor]: Mr. Pasch, he is not Latin.

THE COURT: You don't have to give me reasons for peremptory challenge. Mr. Pasch is not Mexican, go on.

MR. McNERNY: Jury of cross section, Judge."

Defense counsel argues that if we determine that he has failed to prove a *prima facie* case, then, by virtue of the above passage, we should hold that defendant was found by the trial court not to have standing to present a *Batson* violation. From review of this passage in its proper context, it is not absolutely clear that the judge made that specific determination. Arguably, it can be inferred that the judge overruled the defendant's objection after concluding that defendant's and the excluded venireperson's ethnic origins differed; however, the lack of a clear record on this point prohibits us from making that conclusion. If he had disposed of the *Batson* objection solely because of ethnic diversity, his actions would certainly be improper. (*Powers v. Ohio* (1991), 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366 ("a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race").) While *Powers* was decided after defendant was tried, it is still applicable to this case for the same reasons that *Batson* was applied retroactively to cases pending on direct appeal at the time *Batson* was decided. (See *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) Even though racial

identity between the defendant and the excluded venire-person is not required, it still remains a relevant factor in determining whether a *prima facie* case of discrimination has been established. *Andrews*, 146 Ill. 2d at 425.

Assuming, *arguendo*, that the judge had erred by dismissing defendant's objection solely because of the lack of racial/ethnic identity, it does not preclude us from reviewing the trial court record to determine whether defendant made out a *prima facie* case, as he claims existed. This is a logical step since there is no indication at trial (*i.e.*, there was no request for a hearing on the matter, no offer of proof made, or no claim in defendant's post-trial motions), nor does defendant allege on appeal that the trial court prohibited him from presenting any evidence of a *prima facie* case.

There is no indication as to which, if any, of the relevant factors the trial judge considered in analyzing whether a *prima facie* case had been established. The standard to be applied "in reviewing the trial judge's determination on this issue is *not* whether the judge abused his discretion. Rather, it is our role to review the evidence in its entirety and to determine if the trial judge's ruling is against the manifest weight of the evidence." (Emphasis in original.) (*Andrews*, 146 Ill. 2d at 428.) Since there appears to have been no affirmative ruling one way or the other by the judge on this issue, we must determine whether the trial judge's action, or inaction, which presumes the lack of a *prima facie* showing, was against the manifest weight of the evidence. (See *People v. Garrett* (1990), 139 Ill. 2d 189, 202.) Therefore, we believe that it is appropriate to make an objective review of the record.

Defendant, in proving a *prima facie* case of racial discrimination, claims that the State's peremptory challenge eliminated an entire race from sitting on the jury. Although it is true that a *prima facie* case can be estab-

lished where the State excludes the only venireperson of a certain race (see *People v. Jones* (1988), 177 Ill. App. 3d 663), it is not unconstitutional, without more, to strike one or more individuals of a certain race or ethnic origin from the jury. See *Evans*, 125 Ill. 2d at 63-64; *People v. Hooper* (1987), 118 Ill. 2d 244, 247-49 (Ryan, J., specially concurring, joined by Ward and Moran, JJ.).

Except for citing the ethnic origin of the peremptorily challenged venireperson, defense counsel pointed to no circumstances that could support a *prima facie* case of racially motivated discrimination. Defendant alleges no pattern to the State's use of peremptory challenges against Hispanic jurors which would show purposeful discrimination. The trial court, not the prosecutor, conducted the *voir dire*, and defendant does not contend on appeal, nor did he at trial, that the prosecutor's statements in exercising this peremptory challenge indicated that the challenge was discriminatory.

Moreover, due to the lack of an adequate record, we cannot conclude that the State used a disproportionate number of peremptory challenges by excluding this one Hispanic venireperson from the jury. Furthermore, the level of Hispanic representation in the venire (one) as compared to the jury (none) does not indicate purposeful discrimination by the State. Since there was apparently only one Hispanic venireperson excluded (even that being unsubstantiated), we cannot analyze whether the excluded "group" was a heterogeneous group sharing race as its only common characteristic. Finally, of significance is the fact that there is no allegation that this case involves an interracial crime in which any specific racial groups would be prone to show prejudice.

On review of the record, we do not feel that any circumstances were revealed which would be seen by a reasonable trial judge as raising a *prima facie* inference of State discrimination. See *Garrett*, 139 Ill. 2d 189 (on ap-

pellate review, after the trial judge failed to make a determination as to whether a *prima facie* case had been established, the defendant's allegation that the State exercised five out of six peremptory challenges against black veniremembers, without supplementing this fact with any other relevant circumstances, failed to raise an inference of purposeful discrimination).

Therefore, we find that defendant has not met his burden to prove, through facts and relevant circumstances, that the prosecution's exercise of this peremptory challenge was racially motivated, as is required by *Batson*. Consequently, the State was properly never required to provide race-neutral explanations for this challenge, and the defendant was not deprived of his fourteenth amendment right to equal protection.

Defendant's next assignment of error is that the court improperly refused to disqualify certain jurors for cause, in violation of defendant's sixth amendment and fourteenth amendment right to an impartial jury. Defendant argues that the responses of venirepersons Esly, Rogers, and Burdick demonstrated their inability to be fair and impartial, as they were prejudiced against the insanity defense, and that, accordingly, the court's refusal to excuse these potential jurors for cause constituted *per se* reversible error.

When raising an insanity defense, the defendant has the right to have potential jurors asked whether they have any feelings concerning this particular defense. (*People v. Stack* (1986), 112 Ill. 2d 301, 313.) In this case, the court properly inquired of the potential jurors as to their feelings concerning the insanity defense. In the case of these three individuals, their responses to questions posed to them indicated that they had some problem with this defense. The relevant portions of the questioning are as follows:

Potential juror Esly was asked:

"Q. *** How about insanity. Do you feel a person could be insane at the time he did—

A. I do have a problem with temporary insanity.

Q. What is your problem?

A. I don't really believe that. I think people go around committing crimes and they plead temporary insanity—maybe they are and maybe they aren't.

Q. Could you listen to the evidence and determine from that whether or not he was insane? They have to prove by a preponderance of the evidence that he was insane.

A. I probably could.

Q. Could you listen to that?

A. Yes.

Q. And make your mind up?

A. Yes.

Q. Right now, would you say that if his plea was temporary insanity, without having heard any evidence, would you still—could you give him a not guilty by reason of insanity?

A. Not right now.

Q. I know, but without knowing anything about the case, you're not going to find him guilty until—or—

A. Right now, I don't think there is such a thing as temporary insanity as a defense."

Potential juror Rogers was asked:

"Q. How about the defense of insanity. Do you understand that as a proper defense?

A. I could accept it but I would have a skeptical concern about the authenticity of a mental condition involved in any case.

Q. We have expert testimony. Would you consider the testimony and consider what they have to say on the case?

A. Yes, I think I would.

Q. But you could if you were convinced by the expert or by what any other evidence [*sic*] to give a not guilty by reason of insanity if you thought that was a proper judgment?

A. Yes, I believe I could.

Q. Will you follow the law given you by the Court at the end of the trial whether or not you agree with it?

A. Would I follow—

Q. I will instruct the jury at the end of the trial as to the law that is applicable to these charges or this charge whichever it might be. Will you follow that law?

A. Yes, I would.

Q. Without hesitancy?

A. No.

Q. Any reason why you believe you could not give both the State and defense a fair trial?

A. None that I could think of."

Potential juror Burdick was asked:

"Q. What do you think about [*sic*] insanity defense?

A. John Wayne Hinkley comes to mind.

Q. What?

A. The shooting of Reagan comes to mind and I don't agree with that.

Q. That's another incident.

A. I think it's overused.

Q. Would you be guided by that?

A. I think it's overused.

Q. What?

A. I think it's overused.

Q. Well it could be overused. I'm not saying that; but at this point if you just [*sic*] knowing that the insanity plea has been entered, would you right now, wouldn't you even listen if there's any evidence of insanity?

A. I would listen, sure.

Q. Would you consider that evidence.

A. Yes.

Q. Okay whether it came from one side or the other because you see when doctors are put on the stand, they're subject to cross-examination.

A. Yes.

Q. And you understand that?

A. Yes.

Q. And the knowledge that you would gain might be through cross-examination rather than direct examination. Do you understand that?

A. Yes.

Q. Can you follow that?

A. Sure."

After the court's refusal to exclude these three venirepersons for cause, the defense exercised three of its peremptory challenges to dispose of them.

Initially, the State maintains that defendant has waived this issue on appeal since he failed to specifically include these alleged errors in his post-trial motion for a new trial. It is clear that where objections are not presented both during trial and in a post-trial motion, the issue has not been properly preserved for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Here, defendant undoubtedly objected during *voir dire* as to the court's determination not to excuse the three venirepersons. Although defendant's allegation as to this particular error in his motion for a new trial is fairly general, it was sufficient to alert the court as to one of his reasons for requesting a new trial. Therefore, this issue is not waived for purposes of our review.

It is well settled that the party making a challenge for cause must show the existence of a state of mind in the juror that will raise a presumption of partiality. The determination of whether a prospective juror does, or does not, possess the state of mind which will enable him to give an accused a fair and impartial trial rests in the sound discretion of the trial judge. Mere suspicion of bias or partiality in a juror is insufficient to disqualify a juror. Because the trial court is in a superior position to observe the venireperson's demeanor and evaluate the candor of the responses, the trial court's determination will not be set aside on review unless it is against the manifest weight of the evidence. *People v. Cole* (1973), 54 Ill. 2d 401, 413-15; *People v. Davis* (1983), 95 Ill. 2d 1, 19.

From reviewing the record, it is apparent that each of these potential jurors did have some difficulty with the insanity defense. For example, Esly said that she had a problem with the temporary insanity defense, Rogers said that he was skeptical about the authenticity of a mental condition involved in any case, and Burdick said that he believes the insanity defense has been overused. However, all three of these individuals indicated that they could consider the evidence as presented at trial and then make a determination as to whether defendant was sane.

Here, defendant's claim is without merit since he failed to demonstrate that these three potential jurors possessed a disqualifying state of mind. An analysis of the record reveals that the responses of these individuals were not such that it could be determined that they could not be impartial. Because the trial judge was in the best position to observe and evaluate their demeanor, his determination that they could give defendant a fair trial should not be set aside. See *Davis*, 95 Ill. 2d at 19.

In sum, the court's denial of defendant's challenge for cause was not against the manifest weight of the evidence where these venirepersons' responses indicated that they could be fair and impartial. Because defendant could not sustain his burden of demonstrating bias, and could not prove that the court's denial of defendant's challenge for cause was an abuse of discretion, we find that he was not denied his right to an impartial jury.

## THE TRIAL

Defendant next contends that he was denied due process because the conflicting burdens of proof for the not guilty by reason of insanity verdict and the GBMI verdict resulted in the jury's finding of guilty, rather than guilty but mentally ill. The instruction given to the jury for the insanity defense stated that defendant had the

burden of proving his insanity by a preponderance of the evidence. An instruction was also given to the jury that to find defendant GBMI, it had to be proven beyond a reasonable doubt that defendant was not insane at the time he committed the alleged crimes.

This court has previously recognized, in *dictum*, that an instruction requiring a defendant to prove his insanity by a preponderance of the evidence creates an anomaly when combined with the GBMI instruction that the defendant's sanity must be proven beyond a reasonable doubt. (*People v. Fierer* (1988), 124 Ill. 2d 176.)

> "Under the current statutes, the State continues to bear the burden of proving sanity beyond a reasonable doubt for purposes of a GBMI verdict. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) At the same time, the defendant bears the burden of establishing insanity by a preponderance of the evidence for purposes of a not guilty by reason of insanity verdict. Under this scheme, a theoretical class of defendants exists who cannot be found insane and thus [cannot be found] not guilty by reason of insanity, because they have not carried their preponderance burden, but who also may not be found GBMI because their noninsanity has not been proved by the State beyond a reasonable doubt. In other words, defendants whose sanity is a close question, the very group one would think should be covered by the GBMI verdict, may not be found GBMI because they fall into the gap between 'preponderance' and 'beyond a reasonable doubt.' " *Fierer*, 124 Ill. 2d at 189.

Defendant submits that because the evidence concerning insanity in this case is very close, we have one of those instances described in *Fierer*, where the defendant cannot be found GBMI. Defendant contends that had he been found GBMI, it is quite likely that he would not have been sentenced to death, since a jury is not likely to sentence a mentally ill individual to death.

The State initially maintains that defendant has waived this argument for purposes of appeal since he failed to object to the language of the instruction submitted by the State or to offer an alternative instruction. (*People v. Roberts* (1979), 75 Ill. 2d 1.) Further, it asserts that the defendant's failure to raise the alleged error in his post-trial motion waives this issue on appeal. *Enoch*, 122 Ill. 2d at 186.

Defendant, admitting that he may have procedurally waived this issue, nevertheless contends that these jury instructions undermined the fairness of the trial court proceedings and, therefore, this issue should be considered. As previously stated by this court, "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 222; 134 Ill. 2d R. 451(c).) Fundamental fairness includes, among other things, seeing to it that " '[c]ertain basic instructions, essential to a fair determination of the case by the jury (e.g., burden of proof, elements of offense charged), must be given, and the concept of waiver will not be employed to bar reversal if a defendant has been convicted in the absence of these instructions.' " *Roberts*, 75 Ill. 2d at 13, quoting ABA Standards, Trial By Jury, Commentary, at 116 (1968).

In *Fierer*, this court held that it would consider the jury instruction issue on appeal despite the defendant's apparent waiver, since the instruction clearly misstated the burden of proof required to find the defendant guilty but mentally ill (the judge instructed the jury as to the "preponderance of the evidence" standard instead of the "beyond a reasonable doubt" standard), thereby making it easier for the defendant to be found GBMI. In the case at bar, the instructions on the issues of GBMI and insanity mirrored the elements and the burdens of proof contained in the respective statutes.

We find that the fairness of this court proceeding was not so undermined by the giving of these instructions as to avoid the general rule of waiver. Therefore, defendant, by not objecting at trial and by not including the alleged error in his post-trial motion, has waived this argument on appeal. As a result, we do not reach defendant's constitutional question.

Defendant next claims error in the GBMI jury instruction because it failed to inform the jury that the State bears the burden of proving the elements for a GBMI verdict. Again, the State maintains that defendant has waived this argument by failing to object to the instruction when given at trial and not alleging such error in his motion for a new trial.

The following excerpt is that portion of the jury instructions dealing with the not guilty by reason of insanity verdict and the GBMI verdict:

"If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that he is not guilty by reason of insanity of murder of Richard Clark, you should find him not guilty by reason of insanity of murder of Richard Clark, your deliberations on this charge should end, and you should return the verdict of not guilty by reason of insanity on the charge of murder of Richard Clark.

If you find from your consideration of all the evidence that the defendant has not proved by a preponderance of the evidence that he is not guilty by reason of insanity of murder of Richard Clark, then you should continue your deliberations on this charge to determine whether the defendant is guilty but mentally ill of murder of Richard Clark.

A special verdict of guilty but mentally ill shall be returned by you instead of a general verdict of guilty if you find each of the following propositions to be present in this case:

*First*: That the defendant is guilty of murder of Richard Clark; and

*Second*: That the defendant was not legally insane at the time he committed murder of Richard Clark: and

*Third*: That the defendant was mentally ill at the time he committed murder of Richard Clark.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should return the special verdict finding the defendant guilty but mentally ill on the charge of murder of Richard Clark.

If you find from your consideration of all the evidence that either the Second or Third propositions concerning the guilty but mentally ill verdict has not been proved beyond a reasonable doubt, you should return the general verdict finding the defendant guilty of murder of Richard Clark."

The same instruction was given regarding the murder of Shearer.

Defendant claims that these instructions were "given over objection." Upon review, however, we found that the objection by defense counsel did not call this alleged error to the court's attention, but merely stated that he was unhappy with the manner in which the instructions were printed through the State's computer. According to Supreme Court Rule 451(b), objections to proposed instructions must be "particularly specified" to enable the court to take action (134 Ill. 2d R. 451(b)). Thus, defendant's objection was clearly insufficient to constitute a proper objection, and coupled with defendant's omission of this alleged error in his post-trial motion, the issue is thereby waived. *Enoch*, 122 Ill. 2d 176.

Defendant submits that if this court finds that he has waived this argument, we should still consider this issue under the plain error exception to the waiver rule. Consequently, it is necessary to determine whether the alleged defect in the instruction is a substantial one, rising to the level of plain error. Here, the court did not explicitly inform the jurors as to which party carried the bur-

den of proof with regard to the elements of the GBMI verdict. Thus, some confusion may have been created by this instruction. However, before a reviewing court can decide whether an error has occurred in the giving of certain instructions, the jury instructions from the entire trial must be read as a whole. See *People v. Fields* (1988), 170 Ill. App. 3d 1, 11.

In this case, it is doubtful that the jury did not understand the GBMI instruction, which as its name expresses is a verdict of guilty, requiring the State to prove that the defendant was not insane but was mentally ill. Here, the jury was informed that the defendant is presumed innocent, that this presumption remains until the jury is convinced beyond a reasonable doubt that defendant is guilty, that the State has the burden of proving the defendant's guilt beyond a reasonable doubt, and that this burden remains on the State throughout the case.

As a result, the failure of the trial court to specifically acknowledge that the State was the party carrying the burden of proof in the GBMI instruction, in light of the jury instructions as a whole, was not so substantial a defect as to avoid the normal waiver rule that a reviewing court will not review an issue not raised at trial. Consequently, we find that defendant was not denied due process as a result of these instructions.

Defendant next argues that his sixth amendment and fourteenth amendment right to confront adverse witnesses was violated by the State. Dr. Gaspero testified for the defense and Dr. Cavanaugh testified for the State. During the cross-examination of Gaspero and the direct examination of Cavanaugh, the State repeatedly brought out the psychiatric opinions of Doctors Reifman, Waldman, and Wassalau, none of whom testified at trial.

Defendant points to various passages in the record where the prosecutors, during examination of the expert witnesses, referred to the nontestifying experts' find-

ings, including their data, observations, and conclusions. They further elicited this information through the testifying experts' responses. Defendant contends that because of this, it became apparent to the jury that there were three other experts who came to the conclusion that defendant was sane at the time of the charged crimes. Since defendant's only defense in this case was that of insanity, the fact that the jury was under the impression that four experts found defendant sane, while only one found him insane, may have caused it to disregard the credibility of Gaspero's conclusions on sheer weight of opinion alone. Defendant concedes that admission of facts and data contained in the nontestifying experts' reports were properly admissible, but maintains that their conclusions and opinions were inadmissible as highly prejudicial hearsay.

In the case of *Wilson v. Clark* (1981), 84 Ill. 2d 186, this court adopted the standard contained in Federal Rules of Evidence 703 and 705 for the use of expert opinion testimony at trial. It is now clear that an expert can give his opinion based upon facts that are not in evidence if those facts are of a type reasonably relied upon by experts in the particular field. (Fed. R. Evid. 703.) In this case, the experts relied upon reports of other doctors who had analyzed defendant's mental fitness. The psychiatric profession relies heavily upon a patient's psychiatric history in making a diagnosis. (*People v. Anderson* (1986), 113 Ill. 2d 1, 7-8.) Thus, there can be no question that the reports of the other doctors relied upon by the State are of a type customarily utilized by the medical profession.

Initially, we must determine to what extent evidence resulting from the nontestifying experts' examinations of defendant was admissible. Secondly, we must determine in what manner it could have been admitted.

In *People v. Ward* (1975), 61 Ill. 2d 559, this court, relying on Federal Rule of Evidence 703, held that expert medical opinion on the question of sanity, based in part on records compiled by others which had not been admitted into evidence, was permissible if the reports "are of a type customarily utilized by the medical profession." (*Ward*, 61 Ill. 2d at 568.) Through the development of the law in this area, it now appears to be well settled that experts may consider not only medical and psychological records commonly relied upon by members of their profession in forming their opinions (*Ward*, 61 Ill. 2d 559), but they may testify as to the contents of these records as well (*Henry v. Brenner* (1985), 138 Ill. App. 3d 609; *Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933; *In re Germich* (1981), 103 Ill. App. 3d 626; *People v. Rhoads* (1979), 73 Ill. App. 3d 288). Case law supports the proposition that an expert can testify as to nontestifying experts' findings and conclusions. Likewise, it is logical that the attorney may also refer to this source in posing his questions, as long as he is not attempting to elicit inadmissible hearsay. See *Bobb v. Modern Products, Inc.* (5th Cir. 1981), 648 F.2d 1051.

While the contents of reports relied upon by experts would clearly be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and *conclusions* for the limited purpose of explaining the basis for his opinion. (*Anderson*, 113 Ill. 2d at 12.) By allowing an expert to reveal the information for this purpose alone, it will undoubtedly aid the jury in assessing the value of his opinion.

Scattered throughout the examination of both expert witnesses, and to some extent in the State's closing argument, there was reference made to these nontestifying experts' findings and conclusions. Based upon our reading of the record, we find that the references were in fact made to either support or discredit Dr. Gaspero's or

Dr. Cavanaugh's testimony. At no point does the prosecutor dwell on the other experts' conclusions. Dr. Cavanaugh's testimony did not establish the truth of the facts and conclusions contained in the various reports and did not convert that information into substantive evidence, but only demonstrated that he compiled all available medical history on defendant before making his determinations. Further, it is clear from the judge's manner of controlling the introduction of this evidence that his intention was to allow such evidence only for this purpose, and not to prove the truth of the nontestifying experts' findings and conclusions.

We agree with defendant that, to a certain extent, the jury may have been confused as to how this evidence was being introduced. Providing limiting instructions during the trial would have been a preferable way to control the admission of this critical information. However, in the absence of such instructions, since we have determined that the judge's intention, manifested to the jury through his rulings during the trial, was to not allow this evidence substantively, we will not disturb the court's decision. We believe that the judge did not abuse the discretion granted him, and therefore find that defendant's sixth amendment and fourteenth amendment right to confront adverse witnesses was not violated here.

Closely related to the preceding issue is defendant's next alleged error, that the State improperly impeached defendant's expert witness, Dr. Gaspero, with psychological reports upon which he had not based his conclusion. Dr. Gaspero examined defendant to determine his criminal responsibility for the killings of Shearer and Clark. He testified that defendant was legally insane at the time of the killings. A lengthy cross-examination ensued, during which the State asked Dr. Gaspero whether he had heard of Dr. Cavanaugh, and whether he knew that

Dr. Cavanaugh had found defendant to be sane. Dr. Gaspero replied that although he was aware that Dr. Cavanaugh had evaluated defendant, he was not familiar with Dr. Cavanaugh's results and, in fact, had not even seen his reports. Dr. Gaspero was similarly questioned regarding Dr. Waldman's and Dr. Wassalau's evaluations of defendant. He responded that he did not review either of their reports. Since the State cross-examined Dr. Gaspero regarding the reports generated by Doctors Cavanaugh, Wassalau, and Waldman, even though Dr. Gaspero indicated that he had not relied on them, defendant asserts that his conviction should be reversed.

As previously mentioned, under Federal Rule of Evidence 705, as adopted in Illinois, an expert may give an opinion without disclosing the facts underlying that opinion. This places the burden on the adverse party to elicit the facts underlying the expert's opinion. (*Wilson*, 84 Ill. 2d at 194.) Clearly, if an expert admits relying upon a report, that party may be impeached with the contents of that report. (*People v. Silagy* (1984), 101 Ill. 2d 147, 171-72.) What we must determine here is to what extent an expert may be questioned regarding the reports and conclusions of other experts which he did not rely upon in coming to his conclusions.

The defendant points to *Martin v. Zucker* (1985), 133 Ill. App. 3d 982, and *Bobb v. Modern Products, Inc.*, 648 F.2d at 1055-56, as support for the proposition that if an expert did not rely upon a certain report in reaching his conclusion, then he may not be cross-examined concerning the contents of that report. However, those cases are distinguishable from the present one since those courts had different reasons for not allowing the introduction of the evidence. In *Martin*, plaintiff had sought to read verbatim to the jury certain contents of his medical records. This evidence was barred for a combination of reasons, only one of which was that the testifying doctor

did not rely upon it in his testimony, the most important reason being that no foundation could be established for this evidence. In *Bobb*, the evidence was barred since the questioning attorney was clearly trying to "impeach by slipping hearsay evidence into the trial *** where [he] had previously succeeded in keeping out closely related evidence." *Bobb*, 648 F.2d at 1055.

"On cross-examination, counsel may probe the witness's qualifications, experience and sincerity, weaknesses in his basis, the sufficiency of his assumptions, and the soundness of his opinion." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §705.2, at 553 (5th ed. 1990).) An expert may also be cross-examined with respect to material reviewed by the expert but upon which he did not rely. (*Piano v. Davison* (1987), 157 Ill. App. 3d 649, 671-72.) "Counsel is also permitted to test the knowledge and fairness of the expert by inquiring into what changes of conditions would affect her opinion [citation], and in conducting such an inquiry, *** the cross-examiner is not limited to facts finding support in the record." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §705.2, at 555 (5th ed. 1990).) Likewise, an expert may be cross-examined for the purpose of explaining, modifying, or discrediting his testimony, as well as to ascertain what factors were taken into account and what ones disregarded in arriving at his conclusions. See *People v. Fields* (1988), 170 Ill. App. 3d 1, 14.

A thorough review of the record in this case reveals that the prosecutor's cross-examination of Dr. Gaspero as to the other experts' findings was isolated and sporadic. In our view, the data and conclusions drawn from the other experts' reports through the prosecutor's inquiries were not introduced substantively. At no time did the State try to establish that the other doctors declared defendant to be sane. Instead, the inquiries were utilized

to determine if Dr. Gaspero had referred to them in making his determination. Also, he was posed hypothetical questions to determine what effect certain conclusions, if found to be correct, would have on his own conclusion.

The court allowed the State to attack Dr. Gaspero's credibility and the basis of his opinion by asking him whether other experts' data and conclusions would alter his opinion concerning defendant's sanity. It does not matter that Dr. Gaspero did not rely on the other experts' data and conclusions pertaining to defendant. What does matter is that the jury was allowed to properly evaluate his opinion. Because the prosecutor can elicit on cross-examination what factors an expert considered and what factors he disregarded, or simply did not utilize, the cross-examination here was proper.

The basis of Dr. Gaspero's opinion was a critical factor in the jury's assessment of defendant's sanity, and the State could support its theory of defendant's sanity by attacking the defense expert's thoroughness in formulating his opinion. The facts elicited from Dr. Gaspero indicate that his evaluation of defendant may have been based on a somewhat incomplete investigation into defendant's psychiatric and medical history. Thus, the jury was given the factors which Dr. Gaspero took into account, along with the ones he disregarded, in arriving at his conclusion that defendant was insane at the time of the alleged crimes. This information was then used by it to assess the weight to be given to Dr. Gaspero's testimony.

It is well settled that the scope of cross-examination is largely within the discretion of the trial court and that its rulings will not be overturned unless an abuse of that discretion results in manifest prejudice to the defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 149; *People v. Evans* (1988), 173 Ill. App. 3d 186, 203.) In our opinion,

the judge did not abuse his discretion in determining the scope of the State's cross-examination. The prosecutor properly used absent experts' conclusions for the limited purpose of impeaching the witness; therefore, defendant's constitutional right to confront adverse witnesses was not violated.

Defendant's next contention is that his due process rights were violated when he was forced to turn over tape recordings of his interviews with the defense psychologist to the State, whereas he was not allowed to tape-record his interviews with the State's psychiatrist. Nevertheless, the State was required to turn over to the defense all notes from its expert's interviews with defendant.

Defendant asserts that his rights were violated by this discovery inequality, since this likely affected the outcome of the trial. He alleges that since the State had tape recordings of defendant's interviews with Dr. Gaspero, it was much better prepared for cross-examination than the defense was, which had only notes from Dr. Cavanaugh's examination. Therefore, defendant argues, since the trial court erred by not balancing the right to discovery between the defense and the prosecution, as it is required to do by virtue of *Wardius v. Oregon* (1973), 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208, the conviction should be overturned.

Defendant has misinterpreted the holding of *Wardius* to require identical terms for discovery by both parties to the litigation. This is certainly not what the Court intended. It held only that discovery is a two-way street; that it is unfair to require a defendant to divulge information, while at the same time to allow the State secrecy for its own witnesses. (*Wardius*, 412 U.S. at 475-76, 37 L. Ed. 2d at 88, 93 S. Ct. at 2212-13.) By no means did the Court require discovery to be perfectly symmetrical.

Under Illinois Supreme Court Rule 413(c), the State must be informed of, and permitted to inspect and copy, any reports or results, or testimony relative thereto, of physical or mental examinations, or any other reports or statements of experts which defense counsel has in his possession or control (134 Ill. 2d R. 413(c)). This includes psychiatric evaluations performed on defendants who raise the defense of insanity. See *People v. Childers* (1981), 94 Ill. App. 3d 104.

Here, Dr. Gaspero's "reports and results" of interviews of defendant were subject to disclosure under Rule 413(c). Because defense counsel informed the State that there were no notes made during such interviews, but that tape recordings of the conversations were available, defendant was ordered to tender such tapes. Furthermore, the court ordered that these tapes be used only for the purpose of cross-examining Dr. Gaspero as to defendant's mental state, and that at no time should they be used for the purpose of substantively introducing defendant's statements, or as an admission of his guilt.

As defendant is required under Rule 413(c) to make various disclosures to the State, so is the State required to similarly disclose reports or results of physical or mental examinations under Supreme Court Rule 412(a)(iv) (134 Ill. 2d R. 412(a)(iv)). The State's expert, Dr. Cavanaugh, was ordered to submit his "reports and results" to defendant, in conformity with this rule. The Supreme Court in *Wardius* pointed out that "the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their case[ ] and thereby reduce[ ] the possibility of surprise at trial." (*Wardius*, 412 U.S. at 473, 37 L. Ed. 2d at 87, 93 S. Ct. at 2211.) The trial court, by virtue of its orders, complied with this goal.

Dr. Gaspero chose not to take notes during his sessions with defendant, but rather chose to conduct such interviews with the use of a tape recorder. It is irrelevant why he chose to do so, but the fact is that he made this tactical decision to tape-record the sessions, and once he did, the tape recordings became subject to disclosure under Rule 413(c) because they were the only memorialization of the interviews. In contrast, Dr. Cavanaugh did not conduct his sessions with the use of a tape recorder or any audio device and specifically informed the trial court of his "strong professional opinion that psychiatric interviews with the defendant should *not* be audio-taped." (Emphasis added.) He did, however, take extensive notes during his interviews with defendant and these notes were properly tendered to defendant in accordance with Rule 412(a)(iv).

There is absolutely no law which states that a psychiatrist must tape-record his interviews, even where the expert for the opposing party has done so. Accordingly, defendant's claim that he was denied due process because of this inequality is without merit.

Defendant's next argument is that he was denied a fair trial due to certain allegedly inflammatory and improper remarks made by the prosecutor during his opening statement and closing argument. Defendant, in his brief, recounts 24 separate remarks that he believes are, either individually or cumulatively, sufficient to overturn the court's verdict.

Among the allegedly prejudicial comments made during the opening statement were those to the effect: that the jury should have been thinking about punishment; that defendant was a "coward"; and that the prosecutor misstated the burden of proof in reference to the insanity defense. During his closing argument and rebuttal, the prosecutor allegedly erred by: improperly commenting on defendant's demeanor; using manipulative lan-

guage to grossly misstate the purpose of the trial; implying that a defense is an avoidance of responsibility; inaccurately stating what is required to prove the insanity defense; implying that very few people are able to meet the requirements for an insanity defense; drawing conclusions unsupported by the evidence; making reference to defendant's conduct at counsel table; referring to defendant's defense as "temporary" insanity; expressing his opinion on the credibility of defendant's defense; and projecting a threatening image of defendant to the jury.

Many of the remarks complained of were not objected to at trial and were not included in defendant's post-trial motion for a new trial. Absent plain error, these remarks will not be considered as being properly before this court for review. (*Enoch*, 122 Ill. 2d at 186.) We find that none of the unpreserved remarks amount to plain error, under Supreme Court Rule 615 (134 Ill. 2d R. 615), and thus, we will analyze only those remarks which were properly preserved in the record.

Every defendant has the right to a trial free from improper prejudicial comments or arguments by the prosecutor. Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial. *People v. Bivens* (1987), 163 Ill. App. 3d 472, 482.

On the other hand, the prosecutor is allowed a great deal of latitude in making his opening statement and closing argument. (*People v. Hampton* (1979), 78 Ill. App. 3d 238, 243; *People v. Morrison* (1985), 137 Ill. App. 3d 171, 184.) He has a right to comment on the evidence and draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322.) Because the trial court is in a better position than

a reviewing court to determine the prejudicial effect of any remarks made, the regulation of the substance and style of the opening statement or closing argument is within the trial court's discretion. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. (*People v. Morgan* (1986), 112 Ill. 2d 111, 132; *People v. Sheridan* (1978), 57 Ill. App. 3d 765, 772.) The trial court's determination of the propriety of the remarks made will not be disturbed absent a clear abuse of discretion. *Smothers*, 55 Ill. 2d at 176.

Applying these legal principles to the allegedly improper remarks of the prosecutor which were preserved for appeal, taken individually or cumulatively, it is clear that the majority of them either were based on reasonable inferences from the evidence or were not so prejudicial as to amount to reversible error. The few comments that might be considered improper were subsequently cured by the court, either by giving the jury proper instructions on the law to be applied, by informing the jury that opening statements and closing arguments are not themselves evidence, and to disregard any remarks not supported by the evidence uncovered at trial; or by sustaining the defendant's objections, and instructing the jury to disregard the objected-to comment.

From a review of the entire record in the case, particularly paying attention to the comments pointed out by the defendant, we find there was no abuse of discretion by the trial court. Therefore, defendant was not deprived of a fair trial as a result of the allegedly improper remarks.

Defendant next alleges that he was denied due process where the State failed to present a rebuttal witness

to prove that a prior inconsistent statement concerning defendant's sanity was made by a defense witness, Brian Kelly, to the authorities following the April 3 murders. Kelly, a neighbor of defendant, testified as to bizarre behavior exhibited by defendant. On cross-examination, Kelly maintained that he had no opinion of defendant's sanity and that he had never had such an opinion. Nevertheless, the prosecutor questioned him on whether he had made a statement to the authorities, three days after the murders, as to defendant's sanity. He could not remember the conversation, even after being shown the police reports. Subsequently, the State attempted to prove up the impeachment by calling the ex-assistant State's Attorney who had interviewed Kelly regarding his testifying. However, this testimony was objected to by the defense, and sustained by the court, thereby precluding the State's impeachment.

The State now maintains, and we agree, that the defendant has waived this issue for review since he failed to raise this alleged error in his written post-trial motion. As held in *People v. Enoch* (1988), 122 Ill. 2d 176, the failure of defendant to object at trial *and* to raise an allegation of error in his written post-trial motion for a new trial constitutes waiver of the alleged error. Here, defendant failed to raise this point in his post-trial motion; consequently, this argument is waived.

Moreover, there is no evidence that this alleged error falls within Supreme Court Rule 615, which is the limited, plain error exception to the waiver rule (134 Ill. 2d R. 615). The fairness of the trial court proceeding was not undermined by the failure of the prosecutor to perfect the impeachment of Kelly where the record indicates that he attempted to do so, but was unsuccessful. Looking at the entire record, it is clear that this particular error is not a substantial defect which requires re-

view by this court, in the absence of a proper preservation.

Defendant next argues that he was not proven guilty beyond a reasonable doubt of aggravated kidnapping because the State failed to show that he held Jean Wiwatowski *secretly* throughout the 36-hour period. Consequently, defendant argues, he should not have been found eligible for the death penalty on the ground that the murder was committed in the course of an aggravated felony.

Defendant was charged with aggravated kidnapping under section 10—2(a)(5) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(5)). This provision requires proof that defendant knowingly and *secretly* confined another person against his will, and that he did so while armed with a dangerous weapon. (Ill. Rev. Stat. 1985, ch. 38, pars. 10—1(a)(1), 10—2(a)(5).) The secret confinement element of kidnapping may be shown by proof of the secrecy of either the confinement or the place of confinement. (*People v. Mulcahey* (1978), 72 Ill. 2d 282, 285.) This court has a duty to examine the evidence, and if it is so improbable or unsatisfactory as to raise a serious doubt of a defendant's guilt, the conviction will be reversed. *People v. Coulson* (1958), 13 Ill. 2d 290, 296.

In the context of this particular statute, "secret" has been defined as concealed, hidden, or not made public. (*Mulcahey*, 72 Ill. 2d at 285.) The record in this case reveals that very shortly after defendant entered Wiwatowski's apartment, her sister, Mary Wagner, told a neighbor that Wiwatowski was in the apartment with defendant. Defendant never made an attempt to keep her presence a secret, as evidenced by his discussions with the police. In fact, many people were quite aware that Wiwatowski was restrained inside the apartment

with defendant since he made it well known that he was holding her as a hostage.

The State argues that defendant held Wiwatowski secretly because (1) for the entire 36 hours, no one was allowed to rescue her; or (2) for the first 10 minutes of the ordeal, the authorities were not aware that she was inside the apartment with defendant. While it is true that a victim of a kidnapping can be secretly confined as effectively in her own home as if defendant had transported her to some remote isolated place of confinement (*Mulcahey*, 72 Ill. 2d at 285), the fact that no one could rescue her because of the hostage situation did not convert that which was otherwise well known to something that was secretive. Also, there is no authority to support the proposition that a confinement is secret until the "authorities" are notified of it, as long as non-law-enforcement personnel are aware of it.

Based upon the failure to produce any evidence that the confinement was secret, we conclude that the State did not prove the aggravating kidnapping beyond a reasonable doubt, as it was required to do, and therefore we reverse the trial court's finding of guilty on this count. As a result, we must next determine if defendant was properly found eligible for the death penalty.

Defendant's death penalty hearing was divided into two parts. During the first part, the jury was to decide whether the defendant was eligible for a death sentence under the law. If the jury decided that defendant was eligible, then, during the second part of the hearing, the jury was to decide whether the defendant should be sentenced to death. The jury found defendant eligible for the death penalty on the basis of three statutory aggravating factors: felony murder, double homicide, and killing a police officer. The aggravating factor of felony murder which was based on aggravated kidnapping was, as described above, unfounded. The defendant argues

that since one aggravating factor is now found nonexistent, defendant's sentence should be vacated and the cause remanded for a new sentencing hearing.

We find defendant's conclusion to be erroneous. If we did not know which of the aggravating factors the jury found to be present, but only that there was one or more present, then the sentence would have to be vacated, since it then would have been possible that the jury found the defendant eligible solely on the presence of the disqualified factor, the aggravated kidnapping. (See *Zant v. Stephens* (1983), 462 U.S. 862, 880-81, 77 L. Ed. 2d 235, 252, 103 S. Ct. 2733, 2744-45.) However, in accordance with the court's instructions, the jury gave separate consideration to each statutory aggravating factor and, as a result, unanimously found, beyond a reasonable doubt, that each separate factor existed. Consequently, defendant was properly found eligible for the death sentence, based upon the presence of the remaining two factors.

Furthermore, defendant contends that even in the presence of a valid aggravating factor, the death sentence still must be reversed in accordance with *People v. Brownell* (1980), 79 Ill. 2d 508, since Illinois law requires that aggravating and mitigating factors be weighed in determining whether to impose the death penalty. When the jury considered whether to impose the death penalty during the second phase of the hearing, after finding defendant eligible during the first phase, it was required to balance the aggravating and mitigating factors. One of the aggravating factors was that the murders occurred in the course of an aggravated kidnapping. Defendant argues that the jury's balancing would have been different if this factor had been eliminated, with this change affecting the jury's conclusion.

Defendant's reliance on *Brownell* for his contention is erroneous. In *Brownell*, the jury clearly weighed a factor

which was not warranted by the evidence, whereas here the jury did not rely on anything it should not have during the second phase of the hearing. Once it had been determined that defendant was eligible for the death penalty, by virtue of his actions falling within one of the 10 aggravating factors detailed under section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)), the jury could consider *any* aggravating factors. It was not limited to those set forth in subsection (b) in determining whether to impose the death penalty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).) As a result, even though the jury should not have considered defendant's restraint of Wiwatowski in terms of its being a felony, it was entirely proper to have considered defendant's identical conduct as an aggravating factor in determining whether to impose the death penalty.

Therefore, the absence of a conviction for aggravating kidnapping should not have affected the jury's decision here, since the jury would have been able to consider the same aggravating and mitigating factors that the defendant claims it actually did consider. (See *People v. Coleman* (1989), 129 Ill. 2d 321, 347; *People v. Emerson* (1987), 122 Ill. 2d 411, 445.) Thus, defendant's death penalty sentence will not be reversed and remanded for a new sentencing hearing on account of this alleged error.

Defendant next alleges that the court erred by failing to grant his motion for a mistrial following the testimony of Officer Patrick Walsh. Defendant claims that the State did not properly tender, through discovery, the substance of an oral statement made by defendant to Walsh. As a result, the State violated Supreme Court Rule 412(a)(ii) (134 Ill. 2d R. 412(a)(ii)), which requires it to disclose the substance of any oral statements made by the accused, as well as a list of witnesses to the making of such statements.

The State called Walsh, who testified that he responded to the scene of the shooting at approximately 3 p.m. and, shortly thereafter, telephoned defendant. When the State asked Walsh what defendant had said during their conversation, the defense objected and asked for a sidebar. The court overruled the objection and denied the request for a sidebar. Over the defense's continuing objections, Walsh testified that defendant had told him that he would not surrender, that he had bombs, and to send in more police officers because he wanted to kill them. Immediately thereafter, Walsh passed defendant's comments on to Lieutenant Malone, who then relayed them over the police radio. Apparently, this last transmission was tape-recorded. At the conclusion of the direct examination, the court finally allowed a sidebar, during which the defense protested that the State did not reveal, during discovery, the defendant's statements to Walsh or even the fact that Walsh took any statements from defendant.

The State argued that the discovery requirements were fully complied with because Walsh was listed as a potential witness, and the defense had in its possession, for over two years, a tape recording containing the substance of the comments that defendant made to Walsh. The defense responded that Walsh had to be specifically named as the individual who had witnessed these statements, and that a failure to do so was a violation of Rule 412, which unfairly prejudiced the defendant. As a result, defendant requested a mistrial. The court ruled that the defense's failure to interview Walsh during the two weeks after which it was put on notice that he could be a witness caused the problem. Therefore, the court denied its motion for a mistrial. However, because Walsh's testimony was cumulative to the testimony of Lieutenant Kennedy, the court struck it in its entirety, and admonished the jury to disregard it.

Defendant, relying on *People v. Orr* (1986), 149 Ill. App. 3d 348, contends that merely naming Walsh as a potential witness was insufficient to comply with Rule 412, especially in light of the staggering number of individuals listed by the State as potential witnesses. According to defendant, the State was under the obligation to specifically associate the witness with the specific comments of defendant to which he was a witness. Further, defendant concedes that striking testimony may generally be a proper remedy for a discovery violation, but that a mistrial should have been granted in a situation such as the current one, where the jury would be so influenced and prejudiced by the testimony that it would not or could not be fair and impartial, and where the damaging effect of the evidence could not be remedied by admonitions or instructions. *People v. Wills* (1987), 153 Ill. App. 3d 328, 339-40.

During the trial, it was unclear whether the tape recording was ever actually turned over to defendant. At one point, defense counsel indicated that he *might* have it, but that he would have to check to make sure. He never subsequently claimed that he was not tendered the tape in question. Thus, lacking any evidence to the contrary, we will acknowledge that the defense had a timely copy of the tape, as alleged by the State. Additionally, the defense knew that Walsh was a potential witness for the State. However, the State did not inform the defense that Walsh heard the incriminating comments.

The question confronting this court is whether the State complied with Rule 412 even though it had failed to associate the substance of defendant's oral statements with the person who heard them. Section 412 provides that "the State shall *** disclose to defense counsel *** the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." (134

Ill. 2d R. 412(a)(ii).) Rule 412 was not designed to require defense counsel to make assumptions as to which of the State's potential witnesses were present at the time defendant made a statement. (*Orr*, 149 Ill. App. 3d at 359; *People v. Boucher* (1978), 62 Ill. App. 3d 436, 440; *People v. Rand* (1975), 29 Ill. App. 3d 873, 876.) Here, the State knew Walsh would acknowledge that defendant made the statement, and by its failure to specifically name Walsh as the person who heard the statements in question, it clearly violated Rule 412.

Consequently, we must determine if this violation was unduly prejudicial to the defendant or, as the State contends, was merely harmless error. "Supreme Court Rule 412(a)(ii) [citation] was promulgated to protect a defendant against surprise, unfairness, and inadequate preparation [citation], as well as to afford the defense an opportunity to investigate the circumstances surrounding the statement." (*People v. Cisewski* (1987), 118 Ill. 2d 163, 172.) Thus, technical compliance may be excused where the defendant had access to the statements. (*People v. Miller* (1989), 190 Ill. App. 3d 981, 990.) Further, where defendant has not interviewed the known witness, any claim of surprise and prejudice is negated. (*People v. Lasley* (1987), 158 Ill. App. 3d 614, 635.)

> "[T]he failure to comply with discovery requirements does not in all instances necessitate a new trial. [Citation.] A new trial should only be granted if the defendant is prejudiced by the discovery violation and the trial court failed to eliminate the prejudice. [Citation.] Among the factors to be considered in determining whether a new trial is warranted are the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice could have helped the defense discredit the evidence." (*Cisewski*, 118 Ill. 2d at 172.)

Looking at these factors, as well as others, we conclude that this error was harmless. With regard to the factors

pointed out in *Cisewski*, while there is no doubt that defendant killed Leslie Shearer and Officer Richard Clark, it could be argued that the evidence as to his sanity was closely balanced; however, the value of Walsh's testimony in proving defendant's sanity may have been helpful, but was by no means crucial. Finally, the defendant has not demonstrated to this court how any further investigation into defendant's conversation with Walsh could have altered the defendant's trial strategy or possibly changed the outcome of the case.

With regard to additional factors, first, although not identical, the testimony of Walsh was to a large extent cumulative to Malone's testimony which, among other things, revealed defendant's comment that "if any police came in, there was a bomb and it would go off." Second, the defense was on notice as to the statements in question, as they were contained in tape recordings that it presumably had in its possession for over two years. The defense was also aware of Walsh's identity as a potential witness, irrespective of the fact that the State failed to identify him as the individual who heard these particular statements. If the defense had interviewed Walsh, or at least engaged in a more thorough investigation, it is very likely that it would have been fully prepared for this evidence. Finally, the fact that the court did admonish the jury to disregard the testimony (as it believed Walsh's testimony to be cumulative), as well as the fact that the court granted the defense's request for a continuance to investigate the nature and contents of these statements, and any possible witnesses thereto, sufficiently cured any error. As a result, we find this alleged error to be harmless, and will therefore not disturb the court's exercise of its sound judicial discretion in denying the motion for mistrial.

Defendant next contends that the trial court's exclusion of certain out-of-court statements made by defend-

ant during the 36-hour ordeal prevented the jury from receiving an instruction on voluntary manslaughter. The excluded testimony was that of Sergeant James Biebel, a member of the Chicago police department's hostage negotiation team. In that capacity, Biebel talked at length to defendant over the telephone before his surrender.

After being called by the defense to testify, Biebel described how he had made contact with defendant. The defense then asked Biebel what defendant told him had happened. The State, however, objected to the defense's introducing, through Biebel, self-serving statements of defendant as substantive evidence, and particularly objected to the defense's effort to use the statements to support a voluntary manslaughter instruction. The defense responded that it sought to introduce statements made during the negotiation process which would support a voluntary manslaughter instruction. The trial court sustained the State's objection and excluded the testimony.

Subsequently, the defense asked Biebel to relate another conversation that he had with defendant at approximately 8:30 p.m. Here, the State objected on the grounds that the answer would be that defendant had told Biebel that he did not know that the people on the street were police officers and that that was self-serving, exculpatory hearsay. As a result, the trial court sustained this objection as well.

Because the defendant's statements to Biebel were self-serving and exculpatory, the defense claims that it was prevented from presenting evidence that defendant had shot Shearer as a result of an argument in which Shearer first struck him; evidence that defendant was so "hopped up" that he did not know what he was doing at the time he shot Shearer; evidence that defendant was not aware that people on the street were in fact police officers; and evidence that defendant was firing ran-

domly into the street and was not intentionally shooting at any individual.

Following the introduction of all the evidence, the defense tendered to the court a voluntary manslaughter instruction for the killings of Clark and Shearer. The State objected to the use of these instructions, claiming a lack of evidence to support them. The defense countered that the supporting evidence was not admitted substantively only because, at the State's request, the trial court had precluded the defense from asking Biebel about defendant's statements concerning his state of mind at the time of the shootings. The court ruled against giving the jury the voluntary manslaughter instructions.

Defendant now argues that the excluded testimony, in which defendant admitted shooting Shearer and Clark, should have been admissible as an admission. Because admissions are not subject to exclusion as hearsay (*People v. Stewart* (1984), 105 Ill. 2d 22, 57), the defendant argues that the trial court incorrectly excluded Biebel's testimony. According to defendant, the exclusion of the out-of-court statements violated his constitutional right to present a defense, and because the rulings prevented him from receiving instructions on voluntary manslaughter, his eighth amendment and fourteenth amendment rights were violated.

On the other hand, the State argues that any purported statements made by defendant to Biebel concerning his alleged reason for shooting and killing Shearer were not confessions or admissions, but were unreliable hearsay which was insufficient to support a voluntary manslaughter instruction. Furthermore, according to the State, the defendant's contention, that his statements to Biebel concerning his knowledge of police officers on the scene should not have been excluded, is completely without merit. The State maintains that any knowledge on defendant's part concerning who was present at the

scene when defendant shot Clark had absolutely no relevance to whether the jury should have been instructed on voluntary manslaughter.

A statement may be admissible as an admission when it is offered by a defendant against a party, but not when it is offered to support the defendant's own position. (*People v. Berry* (1988), 172 Ill. App. 3d 256, 261; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §802.1, at 595 (5th ed. 1990); Fed. R. Evid. 801(d)(2).) Therefore, because defendant's purported statement to Biebel that Shearer struck him prior to the shooting was not being offered against a party, but was being offered to support defendant's position that he was guilty not of murder, but only of voluntary manslaughter, such statement was not admissible as an admission.

Further, this purported statement not only was inadmissible as an admission, but was properly excluded as hearsay. Here, defendant attempted at trial to elicit, through Biebel's testimony, an out-of-court statement made by defendant. Defendant wanted Biebel to tell the jury that defendant told him that Shearer had struck him and that that was why defendant shot Shearer. Clearly, defendant wanted this evidence elicited at trial to be used as substantive evidence to prove the truth of defendant's own statement. Therefore, such statement was properly excluded by the trial court as hearsay.

Defendant's additional contention, that his statement to Biebel concerning his knowledge of police officers on the scene should not have been excluded, is also without merit. Similarly, this statement is not admissible as an admission since it was offered by defendant only to support his own position. Moreover, defendant's statement was also properly excluded as hearsay, as he wanted this information elicited at trial to prove the very truth of it: that defendant did not know Officer Clark was a police

officer. Because defendant attempted to use this statement to Biebel as substantive evidence to prove his alleged lack of knowledge, Biebel's testimony on this subject was properly excluded as hearsay.

As a result, we find that the trial court did not err in excluding these statements. Defendant was not denied a fair trial and his convictions will not be reversed on this basis.

## SENTENCING HEARING

Defendant next maintains that the introduction of evidence, during both the guilt and sentencing phases of the trial, which revealed the impact of the alleged crimes upon the victims and their families violated defendant's eighth amendment right to a fair trial and sentencing hearing, in that such information substantially prejudiced the jury against him. During the State's opening statement, the prosecutor briefly mentioned the impact of Richard Clark's murder upon his family as well as personal details about his death. The State also discussed the impact of the crimes upon Jenny Wiwatowski, Mary Wagner, and Leslie Shearer's family. During the prosecution's direct examination, Clark's widow was asked certain questions about their family, Clark's awards and commendations received as a police officer, and how she found out about his death. Shearer's widow also testified about their family, as well as how she found out about her husband's death. Moreover, during the sentencing hearing, the prosecutor made several additional references to the crime's impact on the victims' families.

Defendant argues that this evidence is irrelevant in determining defendant's guilt or innocence and should not have been admitted. He further contends that this type of evidence serves only to prejudice the jury against the defendant by appealing to the jurors' emotions. To support his contention, defendant relies upon *Booth v.*

*Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, the United States Supreme Court case which precluded the use of victim impact evidence as unconstitutional. First, focusing upon the guilt phase of the trial, defendant asserts that the testimony relating to the impact of the crimes upon the victims and their families was highly prejudicial, with its only purpose being to divert the jury's attention from the question at hand, namely whether defendant was guilty of the charged crimes. Defendant contends that use of such tactics by the prosecutor deprived him of his due process right to a fair trial and, therefore, his convictions should be reversed.

A review of the complained-of comments and questions reveals that the State did, in fact, introduce some irrelevant victim impact evidence. However, the introduction of this evidence was isolated and sporadic, was incidental to other relevant evidence adduced at trial, was not presented in an inflammatory manner, and did not lead the jurors to believe that it was material. Such evidence concerning a murder victim and his or her family is not prejudicial when elicited in an incidental manner that does not cause the jury to believe it to be material. (*People v. Free* (1983), 94 Ill. 2d 378, 415; *People v. Wilson* (1972), 51 Ill. 2d 302, 305-07.) Further, improper prosecutorial remarks do not constitute reversible error unless they result in substantial prejudice to the accused (*People v. Johnson* (1987), 119 Ill. 2d 119, 139-40) or are a material factor in his conviction (*People v. Johnson* (1986), 114 Ill. 2d 170, 199). Clearly, the introduction of the victim impact evidence in this case did not substantially prejudice the defendant and was not a material factor in his convictions. Here, many of the complained-of questions consisted of merely introductory, foundational questions pertaining to the witness' background, which was proper.

Any attempt to bind this court to the precedent set forth in *People v. Bernette* (1964), 30 Ill. 2d 359, 371 (that where testimony in a murder case that the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error), must fail, as the degree of prejudice, if any, experienced by the defendant in this case is insignificant when compared to that suffered by the defendant in *Bernette*. There, the State presented the victim impact evidence in such a manner as to permit the jury to conclude that it was material to defendant's guilt, unlike the present case in which there was no emphasis placed on this evidence.

With regard to the victim impact evidence introduced during the sentencing phase of the trial, defendant relies upon *Booth* and *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207, which, taken together, held that the eighth amendment prohibits a capital sentencing jury from considering evidence about the victim's family and the murder victim's character. However, both *Booth* and *Gathers* have since been overruled by *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597, which holds that the eighth amendment does not prohibit a jury from considering, at the sentencing phase of a capital trial, evidence relating to a victim's personal characteristics and the emotional impact of the murder on the victim's family. As Illinois has now adopted *Payne* in *People v. Howard* (1992), 147 Ill. 2d 103, we conclude that the State's introduction of this evidence during the sentencing phase of defendant's trial was proper.

We find that the court did not err in allowing the victim impact evidence either during the guilt phase, as it was immaterial and nonprejudicial, or during the sentencing phase, based upon the reasoning of *Payne*,

thereafter adopted in Illinois through *Howard*. Consequently, we will neither reverse the defendant's convictions nor remand this cause for a new sentencing hearing as a result of the introduction of this evidence.

Defendant next submits that this court should vacate his death sentence because it was improperly imposed due to the existence of mitigating factors which were presented by him. The State, however, maintains that the jury properly concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty and, therefore, the trial court properly sentenced defendant to death.

In aiding courts of review, the United States Supreme Court has stated that an analysis of whether a death sentence is proper in a particular case "requires consideration of the character and record of the individual offender and the circumstances of the particular offense." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) As such, this court has determined that, when reviewing a sentence of death, it will make a separate evaluation of the record, but it will not lightly overturn the trier of facts' findings made during the aggravation and mitigation phase of the death penalty hearing when they are amply supported by the record. (See *People v. Christiansen* (1987), 116 Ill. 2d 96, 122; *People v. Odle* (1988), 128 Ill. 2d 111, 130-32.) As this court stated in *People v. Walker* (1985), 109 Ill. 2d 484, 506:

> "In considering petitions to vacate a sentence of death, this court must be mindful of the limitations of its authority: 'Our responsibilities *** neither require nor permit reversal where no reasonable doubt of guilt exists, no reversible error has occurred, and there is no indication that the [sentencing authority] imposed the penalty on other than a reasoned basis.' " *Walker*, 109 Ill. 2d at 506, quoting *People v. Lewis* (1981), 88 Ill. 2d 129, 165.

In the instant case, the jury determined that the mitigating factors presented were insufficient to preclude imposition of the death penalty, whereas defendant believes otherwise. In support thereof, he submits the following facts: that he was a 58-year-old man with no prior criminal record; that he had a history of employment as a tool and die maker; that he had served in the military before being honorably discharged; that he had a history of mental illness, which was deteriorating rapidly in recent years; and that his illness, as well as his severe depression at the time of the killings, triggered this violent episode.

In support of his position, the defendant relies on *People v. Carlson* (1980), 79 Ill. 2d 564, *People v. Buggs* (1986), 112 Ill. 2d 284, and *People v. Johnson* (1989), 128 Ill. 2d 253, and attempts to analogize the facts of his case to these cases. In all three of those cases, the defendants' sentences were vacated, as this court found that the mitigating evidence was sufficient to preclude the death penalty.

We must first briefly review the facts of these cases to determine our reliance upon them. In *Carlson*, the defendant, a 46-year-old, recently divorced man, killed his former wife of 19 years during a dispute over her seeing other men. He shot her 10 times, poured gasoline throughout her house, and then set it on fire. Carlson then went to a bar where he gave a friend a large sum of money for Carlson's son's education. Shortly thereafter, when the police arrived to arrest him, Carlson shot and killed one of the officers. In vacating his sentence, this court noted that Carlson lacked a significant history of criminal activity and that he had acted under an extreme emotional disturbance exacerbated by very poor physical and emotional health. The court also found that Carlson's concern about his son was a mitigating factor.

In *Buggs*, the murder occurred after the defendant and his wife argued, as a result of one of her boyfriends' repeatedly telephoning her. During the argument she told him that he had not fathered two of her sons. At this point the defendant became outraged; he poured gasoline on her, as well as throughout the house, and set them on fire, resulting in the death of his wife and son. Relying on *Carlson*, the court vacated Buggs' death sentence due to the following mitigating factors: that Buggs, who was in his forties, had served 21 years in the military and was then honorably discharged; that he had no history of serious criminal activity; that he had a drinking problem; and that he had marital difficulties which, in fact, triggered the incident. The court concluded that, but for his marital problems, "Buggs would presumably be leading a life acceptable to our society." *Buggs*, 112 Ill. 2d at 295.

Finally, in *Johnson*, the defendant shot and killed one man and wounded two others at a store where he had previously worked. The court vacated his death sentence because of his good character. Among the factors relied upon were that Johnson had graduated from high school with good grades, that he had an insignificant criminal record, and that he had a steady employment history. Also, Johnson's drug and alcohol problems paralleled those of Buggs and Carlson, and the addiction could be blamed for his behavior. This court concluded that the killings had occurred only because he had just been fired from his job, and that he was under the belief that he had been deprived of his final paycheck. The court found that that was an isolated stressful event which had caused the crime.

Each capital case is unique and must be evaluated on its own facts. Here, defendant's crimes apparently resulted from his emotional disturbances. On the day of the murders, defendant was depressed, apparently be-

cause it was his estranged son's 30th birthday and he had not seen him in nearly 20 years. Also, just prior to the murders, defendant apparently had an argument with his landlord. Similar to the cases relied upon by defendant, he had no prior criminal record to speak of.

On the other hand, although defendant had served in the military, it was only for a period of six months. While he was a tool and die maker, his work experience had been very erratic. There was no claim or evidence of drug or alcohol abuse by the defendant, as in the other cases. Further, although defendant claims his actions coinciding with his estranged son's birthday is no coincidence, the fact that he had not seen his son in about 20 years should have minimized the impact of this anniversary. Also, the terrorizing of an elderly lady for approximately 36 hours tends to indicate the existence of a "malignant heart" by the defendant. Finally, in the cases relied upon by defendant, there was some testimony as to the good character of the defendant, while in this case, the little testimony as to defendant's character was either neutral or negative.

In *Carlson, Buggs,* and *Johnson,* this court found that the circumstances of their crimes, as well as the defendants' characters, did not bespeak of men with malignant hearts who must be permanently eliminated from society. In the present case, although there were some mitigating factors presented by the defense, they are not so significant as to preclude the imposition of the death penalty. The facts of this case do not parallel the facts of those cases relied upon by defendant, such that this court is bound to vacate defendant's sentence. Consequently, we will not disturb the jury's finding, as it was rationally based.

Defendant's next allegation of error is that he was deprived of a fair sentencing hearing due to certain remarks of the prosecutor made during his closing and re-

buttal arguments during the second stage of the hearing. To support his contention, the defendant principally relies upon *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633, which stands for the proposition that the prosecution may not lead a jury to believe that responsibility for a death sentence rests elsewhere, when State law places that responsibility on the jury.

The defendant here asserts that the State repeatedly placed the responsibility for the death penalty not on the jury, but on the defendant himself. Defendant first points to the emphasized portions of the following colloquies:

"MR. McNERNEY [Prosecutor]: *** The law states that he shall be sentenced to death unless you find mitigating factors which are sufficient or can overcome the aggravating factors in the case. I tell you, Ladies and Gentlemen, do not let the defense put a guilt trip on you for what the defendant in this case has done.

The defendant murdered, in cold blood, a police officer, his landlord and terrorized a 74 year old woman for hours and hours and hours. Don't let them put the guilt for those acts on you.

MR. SCHOLZ [Defense Counsel]: Objection.

MR. McNERNEY: Because it's there, it's [*sic*] stays there.

THE COURT: Overruled.

MR. McNERNEY: It stays there. It was there when he did it on April 6, 1988, it remains there now. He's a hateful, spiteful murderer.

*Ladies and Gentlemen, in this particular case, he's responsible for the sentence he's received or that he's about to receive.*

MR. SCHOLZ: Objection.

THE COURT: Overruled." (Emphasis added.)

"MR. VELCICH [Prosecutor]: *What you should know, ladies and gentlemen, is you're not alone. It will be your decision, but it isn't your fault that he's facing capital punishment. It's his own fault, it's his own decision. It's*

*his own conduct. He brought himself into this court room* and because he's an American, because this happened in America, he's had this process. He's had three lawyers to help him, to defend him. He's had a fair and honest judge. He's had twelve good and decent citizens to defend him, I'm sorry, to examine him, assist him, to judge him. That's what he's entitled to here. And you are part of that process." (Emphasis added.)

Defendant claims that these comments were improper by virtue of *Caldwell* because they shifted the responsibility for the death penalty from the jury to the defendant. However, we do not believe that these comments misled the jury as to its role in the sentencing process. In *Caldwell*, the prosecutor sought to minimize the jury's sense of the importance of its role by arguing to it that its decision whether to sentence defendant to death would not be the final decision because a higher court, the Mississippi Supreme Court, would review defendant's sentence for correctness. Here, the jury was never misled to feel less responsible for its sentencing decision. The jury was explicitly told that its decision whether to sentence defendant to death was binding on the court and that it should not feel guilty if it chose such a sentence. In addition, both the jury instructions and the verdict forms accurately set forth the law regarding the jury's role in imposing the death penalty. The statements in no way shifted the responsibility of death from the jury to another judicial body, and defendant's attempt to equate himself with a judicial body is unfounded.

Defendant's second claim of error pertains to the following argument:

"MR. VELCICH: *** The police who first arrested him didn't shoot him, not because it was wrong to have shot him, because if any one of the bullets that they fired at him during the course of this incident and [*sic*] hit the mark, we wouldn't be here and no one would say what the police did was wrong because of his conduct. He was

entitled, he was accountable, he was entitled to be convicted and put to death at that point, Ladies and Gentlemen, just as he is now.

> MR. SMITH [Defense Counsel]: Objection.

> THE COURT: Overruled. Proceed.

> MR. VELCICH: But what the police did was to hold him and bring him to law, bring him to justice so that this process could take over. That's why the police held him. Just because the police didn't [take] the law [into their own hands] doesn't mean that you aren't allowed to follow it."

From this remark, defendant claims that the prosecutor "urged" the jury to "entirely abrogate" its responsibility to decide whether defendant should be sentenced to death. Generally, prosecutors are permitted wide latitude in their closing arguments, although their comments must be based on the facts in evidence or upon reasonable inferences drawn therefrom. (*People v. Terry* (1984), 99 Ill. 2d 508, 517.) However, comments by the prosecutor which might ordinarily be considered improper are proper in rebuttal argument when they are an invited reply to improper comments made by defense counsel in his own closing argument. (*People v. Vriner* (1978), 74 Ill. 2d 329, 343-44.) In reviewing prosecutorial misconduct, the closing arguments of both the State and defense must be examined in their entirety and the complained-of comments must be placed in their proper context. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76.) When placing the prosecutor's comments in their proper context, it is apparent that his remarks were clearly invited by the defense counsel's argument, as detailed below:

> "Revenge is contrary to why we're here. If we wanted revenge, the police would have gunned John down as soon as he walked out of that building. *** There was not a reason to shoot him down. If there was a reason to shoot him down, he would have been gunned down out in

208

the street, out on Lill Street on the morning of the 5th. The police knew that was wrong and they wouldn't do it. *And now you're being asked to do something*, strangers are being asked to do something that the participants in the event at the time knew was wrong to do. *And that is to take his life in cold blood.*" (Emphasis added.)

As is evident from defense counsel's remarks, he initiated the line of argument concerning whether it was "right" or "wrong" for the police to have shot defendant on Lill Street. Thus, the prosecutor was simply responding to defense counsel's assessment of the situation. Therefore, because this was invited reply, defendant cannot now claim error.

Defendant's third claim of error regarding the alleged "shifting of responsibility" pertains to the prosecutor's remark: "You're not killing him, you're following the law, you're following the law that you've sworn to uphold." This argument was entirely proper where the prosecutor was simply focusing on the jury's duty to follow and enforce the law. These comments did not tend to minimize the jury's sense of responsibility for determining the appropriateness of imposing the death penalty.

Defendant's fourth allegation of error is that the prosecutor improperly informed the jury that defendant might commit crimes in the future. The allegedly improper remarks are emphasized in the following excerpt:

"MR. VELCICH: *** What you have, Ladies and Gentlemen, during the course of this case heard is evidence that this defendant committed crimes and controlled a neighborhood and city and police department in such a way that the ultimate punishment is the only punishment. Because you know what he's about, you know what he likes to do. You know he likes to sit and read and that's what he'll do in prison. And that's all he'll do in prison.

*I don't know whether, in the future he'll ever commit any crimes, they say he won't. They guarantee you he won't.*

MR. SCHOLZ: Objection.

MR. SMITH: Objection.

MR. VELCICH: *I can't say that. I don't know.*

THE COURT: The objection is overruled. Proceed.

MR. VELCICH: *I can't guarantee that and I won't comment on it,* but I would like to tell you some of the things that show you what he is. His evidence doesn't show you anything. There aren't any mitigating factors sufficient to overcome the murders of these people." (Emphasis added.)

It is clear that the record belies defendant's assertion, because the prosecution never stated that defendant would, or even might, commit a future crime. He merely stated that he *did not know* whether defendant would ever commit a crime. In fact, the prosecutor specifically told the jury, "I won't comment on it." Further, he was specifically responding to what he considered to be the defense's claim of an absolute guarantee, something the prosecutor said he could not give.

Defendant's fifth contention was that it was improper for the prosecutor to argue to the jury that it should not feel guilty about imposing a sentence of death where it was a known fact that defendant, and no one else, killed Leslie Shearer and Officer Richard Clark. Defendant claims the following argument by the prosecutor was improper:

"MR. VELCICH: Let's look at what he is and what he's done. First of all ladies and gentlemen, as you deliberate this case, there's one thing that's almost so obvious that I don't even have to say it, but think about this, there will never, ever, ever be a day when anyone will ever step forward and say that it wasn't John Pasch. That the wrong man was sentenced or condemned to death. That will never happen. From the moment we walked into this court room, everyone knew that this was

the man who committed these crimes. So you will never, ever have anyone come forward and say the wrong man was convicted or the wrong man was condemned to death. You will never have that happen. It's obvious but it's important. Because that removes from you, any kind of guilt you may feel, and ladies and gentlemen, I'm not being unrealistic. This is not an easy thing for you. I know when you came in here three weeks ago you didn't expect that you would be· facing these kinds of issues. These kinds of things. I'm not taking this lightly. I don't think you are either.''

The prosecutor's argument was based on the evidence presented at trial which proved that no one other than defendant had murdered Shearer and Clark. As the defense never challenged that allegation, but relied solely on the fact that defendant was insane, these comments were not unduly prejudicial to defendant. More importantly, as defense counsel consistently attempted to place guilt on the jurors during his closing argument, the prosecutor was justified in clarifying the jurors' roles, and reminding them that they should not feel guilty for performing their duty as jurors.

Relying on *People v. Fields* (1990), 135 Ill. 2d 18, 66-69, which held that after a defendant has been convicted, he does not have the right to argue to the jury that any doubts that it might have about his guilt should be considered to be mitigation, defense counsel here makes the reciprocal argument: that it is equally improper to argue that the lack of doubt as to defendant's guilt is a reason to impose the death sentence. However, defendant's contention does not necessarily result from *Fields'* holding, nor is there any case law directly supporting his proposition. Moreover, the State focused upon the lack of doubt as to defendant's participation in the killing of Shearer and Clark, not because it could be considered as an aggravating factor to be weighed by the jury, but instead to respond to defense counsel's con-

sistent attempts to place guilt on the jurors during its closing argument of the sentencing hearing, or in other words, invited reply. As such, we are hesitant to disturb the trial court's discretion in allowing this argument to be used.

Defendant's sixth contention is that the prosecutor repeatedly misstated the law by arguing that evidence was not mitigating unless it excused the crime. Defendant first claims that the prosecutor's argument pertaining to Dr. Gaspero was improper, as shown below, with the complained-of portions emphasized:

"MR. VELCICH: Now, they claim that because of Dr. Reifman, the doctor's new light in this court room, there's no evidence, there's something that you've never heard of before because of Dr. Reifman.

MR. SCHOLZ: Objection.

THE COURT: Overruled. Proceed.

MR. VELCICH: Dr. Reifman, ladies and gentlemen, testified that the defendant has a disorder, a mood disorder and dysthymia. That's the same thing you've known from the beginning of this case until right now. He says it's moderate, just like Dr. Cavanaugh.

MR. SCHOLZ: Objection.

THE COURT: Overruled.

MR. VELCICH: *No one, no one except Dr. Gesparo [sic] ever said that that conduct, this disorder, this mood disorder, his bad mood and his depressed feeling excused his crime. Nobody said that. Nobody can say that except Dr. Gesparo. [sic]*

MR. SCHOLZ: Objection, he never said that.

THE COURT: Overruled.

MR. VELCICH: Dr. Reifman didn't say that and they haven't shown it. *He has a mental disorder and it can be considered by you to be an emotional and significant or emotional disorder according to the instructions that you will get from the judge. But just because he has operated under some kind of a depression at the time he committed these crimes doesn't mean that that excuses these crimes.* The law is that those conditions, those miti-

gating factors may exist but they don't have to overcome the aggravating factors that you know exist, that you have already found beyond a reasonable doubt. So Dr. Reifman wasn't anything new today. Dr. Reifman knows what he's talking about, that this man was depressed, that he had a condition but no one except Dr. Gesparo [*sic*] claims that it excuses his conduct.

    MR. SCHOLZ: Objection.

    MR. VELCICH: That's not a mitigating factor.

    THE COURT: Overruled.

    MR. SCHOLZ: Objection, that's not the issue.

    THE COURT: The objection is overruled.

    MR. VELCICH: And outweighs the terror of Lill Street that came from that man, and not from you." (Emphasis added.)

Specifically, defendant claims that the prosecutor "plainly stated that evidence did not mitigate the offense unless it excused the offense." Although focusing only on those portions of the record specified by defendant may give credence to his contention, it is essential to look at the comments in their proper context. Taken as a whole, we do not believe that the argument is misleading, as the prosecutor clearly stated that the mitigating factor of a mental or emotional disorder "may exist but they don't have to *overcome* the aggravating factors that you know exist." (Emphasis added.)

Defendant's final contention with regard to the second stage of the sentencing hearing pertains to an alleged misstatement of evidence. Specifically, defendant claims that the prosecutor misstated the evidence presented through Lieutenant Kennedy's testimony concerning various bombs which were found in defendant's apartment. During the rebuttal argument, the following discussion took place:

    "MR. VELCICH: Well, do you remember what Lt. Kennedy said about the defendant's apartment? During the course of the hostage negotiations before the defend-

ant was arrested, they managed to break into his apartment and they found a mess and they also found some bombs, some explosive makeshift bombs.

MR. SMITH: Objection.

MR. SCHOLZ: Objection, untrue.

THE COURT: The objection is overruled.

MR. VELCICH: The lieutenant told you that those bombs had some fire crackers or fuses and wicking material."

This rebuttal argument, based on the testimony provided by Lieutenant Kennedy at trial, was proper commentary. Kennedy testified that upon arriving at the scene, he spoke with a detective who had entered defendant's apartment "and they showed me a jar, an empty mason jar where a hole was put in the lid of it and a fire contractor had been inserted and some fusing attached." Kennedy further stated that defendant himself told Kennedy that he had a "bomb and it would go off" if the police attempted to enter the apartment where defendant was holding his hostage. Thus, the prosecution's characterizations were proper inferences to be drawn from Kennedy's testimony. Consequently, we find that the prosecutor's closing and rebuttal arguments made during defendant's sentencing hearing did not deprive defendant of a fair hearing.

Defendant next challenges the jury's finding of his eligibility for the death penalty on the ground that defendant did not know and should not have known that Officer Richard Clark was a police officer. To support his contention, defendant relies on the fact that Clark was dressed in plain clothes, arrived in an unmarked car, and never announced that he was a police officer. The standard of review to be applied in sufficiency of the evidence arguments is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the offense beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 49.

Officer William Simmons stated during his trial testimony that he arrived at the 1400 block of West Lill Street at approximately the same time as Officer Prueser, that he parked his marked squad car at an approximately 45-degree angle in front of 1425 West Lill, and then shortly thereafter heard several shots fired.

Dawn Terry, an eyewitness to the murder of Shearer, testified that after defendant shot Shearer, he ran back into his basement apartment and returned outside with a duffel bag and a "rifle-type gun." He then ran up the stairs at 1427 West Lill, where he attempted to pull a screaming Mary Wagner into her house. As he struggled with the older woman, he turned his head east toward Southport Avenue, resulting in her tumbling down the stairs. Defendant then grabbed his duffel bag and gun and ran into Wagner's house.

Joan Johnson testified that on April 3, 1986, at approximately 3 p.m., she was on the porch of her house located at 1440 West Lill when she saw Wagner standing on her porch shouting, "My God, what have you done now." She then saw defendant run up Wagner's stairs and onto her porch, with a gun in his hands. During this time, Johnson heard sirens and, similarly to Terry, saw defendant look towards Southport Avenue, the direction from where the sirens were coming.

Officer Clark's partner, Officer Ricky Galbreth, testified that upon arriving at the scene, Clark and he approached the area where uniformed Officer Ronnie Prueser was speaking with some people in the neighborhood concerning the shooting of Shearer. Officers Clark and Prueser then walked westbound along the parked cars on the street until they stopped behind a blue car parked in front of 1429 West Lill. As the officers were crouched behind the car and Officer Galbreth was posi-

tioned near the front steps of 1425 West Lill, the front door of 1427 West Lill opened and defendant shouted, "You're never going to get in here," and then slammed the door. At that point, Galbreth heard Prueser tell Clark to get down because defendant had a gun. Galbreth saw defendant, who was standing in the window with a rifle, fire a shot, hitting Officer Clark.

From this testimony, it can be reasonably inferred that defendant knew or should have known that Richard Clark was a police officer in the course of performing his duties. Both Terry and Johnson testified that defendant turned his head in the direction from where the police sirens were coming and, after he entered the apartment, at least one squad car pulled up very near the house in which defendant had positioned himself. Logic also dictates that defendant knew or should have known that the police were informed of the shooting of Shearer and that it would just be a matter of minutes before their arrival on the murder scene. Indeed, when defendant opened the front door to the apartment and shouted to the officers that they were "never going to get in," he knew that the police had arrived and began his preparations for the ensuing hostage situation. When defendant opened the door, he may very well have seen Officer Prueser in uniform directly outside the house situated near the parked cars, even though he was crouched down, and would have certainly seen the marked squad car which was blocking the street at a 45-degree angle.

Additional testimony revealed that defendant told Stanley Reed during their telephone conversation that he had killed two people and that one of them was a police officer. Defendant also told Sergeant Biebel during one of their phone conversations that he "killed two people, one was a cop, the other I shot in the back." Finally, during his conversation with Officer Walsh just minutes after the shooting, defendant stated that "[h]e had ar-

mor piercing ammunition, and he wanted to kill *more* policemen." (Emphasis added.)

After viewing all of the testimony by the witnesses on the scene and the defendant's own statements pertaining to the murder in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant knew or should have known that Richard Clark was a police officer in the course of performing his duties. Therefore, defendant is not entitled to a new sentencing hearing because of this alleged error.

Defendant next contends that he was denied a fair capital sentencing hearing because the State introduced irrelevant testimony during the first phase of the hearing. Officer Walsh of the Chicago police department testified that he telephoned defendant shortly after he had shot Shearer. Defendant told Walsh "that he had material to make gasoline bombs. He had armor-piercing ammunition, and he wanted to kill more policemen." Defendant alleges that the testimony is not relevant to prove any aggravating factors, which is the focus of the first phase of the sentencing hearing, and was therefore unduly prejudicial to the defendant.

In reviewing this issue, we find that defendant has waived any alleged error here by failing to object to such testimony and to raise this issue in a post-sentencing motion. (See *Enoch*, 122 Ill. 2d 176.) This waiver rule applies not only during the trial, but also during the sentencing hearing. (See *People v. Moffitt* (1985), 138 Ill. App. 3d 106, 113.) Furthermore, the introduction of this testimony does not amount to plain error, and will not be reviewed under the plain error exception to the waiver rule, as it was cumulative to that which was previously introduced into evidence. Walsh's testimony was elicited to show that defendant knew that he had killed a police officer in the line of duty, and was therefore eligible for

the death sentence. The testimony regarding the ammunition and bombs was inconsequential to the relevant portions of this testimony.

Defendant's further claim that his counsel was ineffective for failing to object to Walsh's testimony is meritless, as defendant cannot meet the standard set forth by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504. Defendant has not established that counsel's performance was seriously deficient, nor has he established that but for the alleged error, the outcome of the first phase would have been different. Consequently, defendant's death sentence will not be vacated due to this testimony.

Defendant next alleges that the GBMI instruction given to the jury at the conclusion of the guilt phase of the trial was reasonably likely to have caused the jury to disregard the mitigating factor of extreme emotional disturbance during the sentencing hearing. Specifically, defendant points out that because the jury had already found defendant guilty, instead of guilty but mentally ill, it would have been impossible for the jury to find that he was suffering from an extreme mental disturbance, which constituted his "defense" to the death penalty.

However, we find that defendant has waived this issue on appeal because he failed to object to this instruction at trial and raise this issue in his post-trial motion (*Enoch*, 122 Ill. 2d 176), nor did he raise this point during the sentencing phase to alert the court as to this alleged error. Furthermore, as this alleged error did not deprive defendant of a fair trial or sentencing hearing, we will not invoke the plain error rule to review this issue.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant next makes a series of challenges to the death penalty statute itself. We hold here, however, as we have in numerous other cases, that these challenges are without merit. Defendant first contends that the Illinois death penalty statute places the burden of persuasion on the defendant, thereby violating the eighth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VIII, XIV).

The Illinois death penalty statute states, in pertinent part, as follows:

> "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." Ill. Rev. Stat. 1989, ch. 38, par. 9—1(g).

This court has repeatedly stated that no unconstitutional burden-shifting is encompassed within this provision. (*People v. Thomas* (1990), 137 Ill. 2d 500, 537; *People v. Jones* (1988), 123 Ill. 2d 387, 426-27; *People v. Morgan* (1986), 112 Ill. 2d 111, 147-48; *People v. King* (1986), 109 Ill. 2d 514, 546-47; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.) Therefore, we decline to reconsider the constitutionality of this provision in light of the fact that defendant has not brought to our attention any recent developments which render these prior decisions invalid.

Defendant further contends that various features of the Illinois death penalty statute, which this court has found individually constitutional, are unconstitutional in their totality because together they result in arbitrary and capricious imposition of the death penalty. Defendant contrasts Illinois' statute with provisions of other States' statutes which allegedly impose more controls over the decision to impose death. But the "fact that other States have enacted different forms of death pen-

alty statutes which also satisfy constitutional requirements casts no doubt on [one State's] choice." (*Blystone v. Pennsylvania* (1990), 494 U.S. 299, 309, 108 L. Ed. 2d 255, 266, 110 S. Ct. 1078, 1084.) This court has carefully reviewed each of the components of defendant's challenge as well as their combined effect, and has concluded that the statute minimizes the risk of arbitrary and capricious death sentences sufficiently to satisfy the Constitution. "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." (*People v. Phillips* (1989), 127 Ill. 2d 499, 542-43; see also *People v. Bean* (1990), 137 Ill. 2d 65, 141; *Thomas*, 137 Ill. 2d at 549-50.) Therefore, defendant's unconstitutionality arguments are without merit, as he presents no ground for overruling these decisions.

For all the reasons stated, we affirm the defendant's convictions and sentence for murder and reverse his conviction for aggravated kidnapping. The clerk of this court is directed to enter an order setting Tuesday, January 26, 1993, as the date on which the death sentence, entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1989, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution in which the defendant is confined.

*Convictions affirmed in part*
*and reversed in part;*
*death sentence affirmed.*

CHIEF JUSTICE MILLER, concurring:

I concur in the court's judgment and join much of the majority opinion. I write separately, however, to address further two questions raised in the opinion: the

resolution of the defendant's claim under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and the introduction of testimony relating the opinions of several nontestifying experts.

During jury selection, defense counsel objected on *Batson* grounds to the State's exercise of a peremptory challenge against a Hispanic member of the venire. The trial judge declined to consider the merits of the defendant's claim, apparently on the ground that the non-Hispanic defendant did not have standing to raise the issue. As the majority opinion recognizes, the trial judge's reason for refusing to consider the defendant's *Batson* claim is invalid. Later case law confirms that an accused may raise a *Batson* claim even though he does not share the ethnic identification of the excluded venireman. *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (white defendant may raise *Batson* claim regarding exclusion of black members of venire); *People v. Andrews* (1992), 146 Ill. 2d 413, 425.

Beyond the remarks quoted in the majority opinion, however, defense counsel made no attempt, in the face of the trial judge's adverse ruling, to provide any further evidentiary support for the *Batson* claim. Although doubts arising from the incompleteness of the record do not automatically foreclose our review of this issue (see *Andrews*, 146 Ill. 2d at 434-35 (defendant's failure to establish number of blacks in venire not fatal to *Batson* claim)), uncertainties in the record may be resolved against the defendant and in favor of the State. In the present case, surname alone provides one basis for determining the ethnic ground at issue—the excluded venireman was Hispanic—and a review of the record shows that the prospective juror in question was the only Hispanic-surnamed member of the venire.

There is no "pattern," as such, to discern in the improper exclusion of the solitary representative of a particular group. To show that the prosecutor acted in a discriminatory manner, a defendant in these circumstances will necessarily rely on comparisons between the excluded juror and jurors of other ethnic groups retained by the prosecution. Whether the offense involved persons of different ethnic groups or otherwise had racial or ethnic overtones may also be significant, as the majority suggests. Apart from the excluded juror's ethnic identification, however, the present defendant has offered nothing in support of his contention that the prosecutor acted improperly. On this record, then, I agree with the majority's conclusion that the defendant has failed to establish a *prima facie* case of purposeful discrimination.

I do not endorse, however, the majority's unnecessary suggestions that the trial judge implicitly found the defendant's proof inadequate to establish a *prima facie* case and that what we are actually reviewing here is that unstated finding. (152 Ill. 2d at 163.) As I have noted, the trial judge declined to consider the *Batson* claim, apparently on the ground that the defendant lacked standing to challenge the Hispanic venireman's exclusion; nothing in the record indicates that the judge also analyzed this question on its merits.

The defendant also contends that the State improperly presented evidence that three experts who did not testify at trial had concluded that the defendant was sane. I agree with the majority's resolution of this question, but I believe that the rules permitting such inquiries are broader than the majority suggests.

During the defendant's case in chief, the prosecutor cross-examined the defendant's expert, Dr. Gaspero, about the opinions of three nontestifying experts—Dr. Reifman, Dr. Waldman, and Dr. Wassalau—who had

previously examined the defendant and found him sane. Later, in rebuttal, the prosecution also questioned its own expert witness, Dr. Cavanaugh, concerning these nontestifying experts' opinions. Finally, during closing argument, the prosecution mentioned the opinions not only of the two testifying experts, Dr. Cavanaugh and Dr. Gaspero, but of the three nontestifying experts as well. The defendant contends that the State's uses of the nontestifying experts' opinions were all erroneous.

Considering first the direct examination of the State's rebuttal witness, Dr. Cavanaugh, I agree with the majority's conclusion that the prosecutor properly questioned the witness concerning data, conclusions, and opinions produced by nontestifying experts who had previously examined the defendant. Federal Rules of Evidence 703 and 705, as adopted by this court in *Wilson v. Clark* (1981), 84 Ill. 2d 186, permit an expert witness to testify regarding information not in evidence if the information is of the type reasonably relied on by experts in that particular field. Contrary to the defendant's contention here, the range of information that may be presented under Rule 703 includes not only raw data generated or compiled by others but also opinions and conclusions of others. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §703.1, at 522 (5th ed. 1990).) There is no question in this case that the opinions of the three nontestifying experts are of the type reasonably relied on by psychiatrists and psychologists, and thus there was no error in the State's direct examination of its own expert, Dr. Cavanaugh. See *People v. Ward* (1975), 61 Ill. 2d 559.

The State's cross-examination of the defendant's expert witness, Dr. Gaspero, was also proper. Discussing the examination and cross-examination of expert wit-

nesses under Rules 703 and 705, Professor Graham writes:

"A difficult situation may arise when the cross-examiner attempts to add facts, rather than subtract or alter those facts upon which the expert actually relied, to test the expert's qualifications, knowledge, fairness, or basis of opinion. If the fact, data, or opinion which the cross-examiner seeks to add to the expert's basis has been or will be otherwise introduced in evidence, or is contained in a learned treatise, cross-examination is proper. Similarly, if the additional fact, data, or opinion has been or will be reasonably relied upon under Rule 703 by an expert called as a witness by the cross-examiner during his case in chief, cross-examination is proper." Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness*, 1986 U. Ill. L. Rev. 43, 70.

(See also M. Graham, Handbook of Federal Evidence §705.3, at 684 n.4 (3d ed. 1991).) Indeed, cross-examination may be proper even when the additional fact or opinion is not introduced into evidence and is not relied upon by another expert witness at trial. In determining the appropriate scope of cross-examination in that case, the trial judge must consider whether the probative value of the challenged inquiry outweighs the risk of unfair prejudice to the opposing party. 1986 U. Ill. L. Rev. at 70.

In the present case, the State's cross-examination of Dr. Gaspero did not go beyond the information later elicited during the rebuttal testimony of Dr. Cavanaugh, the prosecution's expert. Accordingly, there was no error in the prosecution's questioning of Dr. Gaspero about the views of the nontestifying experts.

The prosecution went beyond these limits and made substantive use of some of the out-of-court opinions in closing argument, however. At several points during argument, in urging the jury to reject the defendant's

insanity defense, the prosecution noted that the non-testifying experts had found the defendant sane. These comments were erroneous, for facts and opinions of nontestifying experts presented through Rule 703 testimony are not substantive evidence. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §703.1, at 521, 523 (5th ed. 1990).) The remarks were isolated, however, and I do not believe they could have affected the jury's determination of the sanity issue.

For the reasons stated, I concur in the judgment of the court.

JUSTICE FREEMAN, also concurring:

I agree with the majority opinion. However, I raise here two concerns, both related to the questioning, during *voir dire*, of Susie Esly, Henry Rogers, and Thomas Burdick regarding the defense of insanity. See 152 Ill. 2d at 165-68.

I agree with the conclusion that the responses given by Rogers and Burdick indicated that, despite being troubled by the nature of the defense, they could consider the evidence as presented and make a determination of defendant's sanity. I am less certain of the conclusion, however, that Esly's responses indicated that she possessed the same ability. See 152 Ill. 2d at 169.

Esly revealed that she did not "believe" in the defense of insanity, explaining that she felt the defense was asserted indiscriminately in efforts to avoid the consequences of criminal conduct. (152 Ill. 2d at 166.) Although she thereafter affirmatively responded that she could "probably" listen to the evidence presented and make a decision on the issue, she iterated, as a final remark on the matter, that she did not "think there [was] such a thing as temporary insanity as a defense." 152 Ill. 2d at 166.

Esly's responses are incongruous. If, as she stated, she could not accept the validity of the defense in the abstract, it seems to me that she could never consider fairly the evidence presented on the issue in this defendant's case. Esly's simple acknowledgments that she could listen to the evidence and form an opinion, sandwiched as the acknowledgments were between Esly's formulated statements that she did not believe the insanity defense existed, are not entirely convincing to me in that regard. I think Esly should have been excused for cause. That said, however, I agree with the majority's conclusion that the failure to excuse Esly on that basis provides no reason to disturb defendant's convictions. There is no indication that defendant was prejudiced by having to use a peremptory challenge.

The second concern I have regards the conclusion that defendant properly preserved for review the issue relating to the failure to exclude Esly, Rogers, and Burdick for cause. The majority finds that the requirements for preserving that issue were satisfied. In so concluding, the majority relies on *People v. Enoch* (1988), 122 Ill. 2d 176, which is universally cited for the rule that issue preservation requires both a timely trial objection and a written post-trial motion. (*Enoch,* 122 Ill. 2d at 186.) Although I agree with the ultimate determination here that defendant was not denied his right to an impartial jury, defense counsel never expressly objected to the trial judge's denial of the requests to excuse the three venirepersons for cause. The record shows only that defense counsel acknowledged having to use a peremptory challenge to remove each from the venire.

The bare mention or allusion to some matter cannot suffice as a proper timely trial objection for purposes of the waiver rule. There must be discernible disagree-

ment with respect to the issue documented in the transcript. I would point out in that regard that defense counsel was careful to cause the record to reflect clear objections at other points during *voir dire* when he so desired. (See, *e.g.*, 152 Ill. 2d at 161-62 (reflecting that defense counsel objected to the exclusion of venireperson Maldonado because he was Hispanic).) Because the record does not contain any objection to the trial judge's refusal to permit the three venirepersons to be excused for cause, I would have concluded defendant waived the opportunity to raise the issue here.

I am more troubled by the language used by the majority in concluding that defendant did not waive the issue regarding the failure to excuse the three venirepersons for cause. I am concerned that the opinion indicates, inaccurately, implicit approval of a relaxed scrutiny to determine whether the requirements for issue preservation have been met. I believe the language used by the court here could be mistakenly read as some departure from those standards.

Regarding the required timely trial objection, the majority concludes that defense counsel "undoubtedly objected" during *voir dire* to the trial judge's decision not to excuse the three venirepersons for cause. (152 Ill. 2d at 168.) I cannot join in any conclusion suggesting that the allusion to a fact, here, defense counsel's acknowledgment of the refusal to excuse the three venirepersons for cause, is determinative that an objection to that fact was raised. The transcript shows no expression of voiced disagreement with the trial judge's decision not to excuse the three venirepersons for cause. The expression of voiced disagreement is all and everything that is required in the way of a trial objection to preserve an issue for review. The objection must appear of record. Whether or not an objection

was "undoubtedly" raised is of no consequence to application of the waiver rule.

Language used regarding the requisite post-trial motion is similarly problematic but particularly more disturbing given that the majority's analysis is entirely unnecessary. The statutory requirement of the filing of a post-trial motion is interpreted to require defendants to point out, specifically, the complained-of issue to preserve it for review. (Ill. Rev. Stat. 1985, ch. 38, par. 111—6.) General statements of error will not do. (See, *e.g., People v. Thomas* (1984), 121 Ill. App. 3d 883.) However, in *People v. Enoch,* this court held that defendants in capital cases are not precluded from raising certain issues on appeal in the absence of a post-trial motion where a proper trial objection has been made. (*Enoch,* 122 Ill. 2d at 190.) Specifically, issues related to deprivation of constitutional rights objected to at trial which may be raised in a post-conviction petition, issues relating to the sufficiency of the evidence, and issues relating to plain error are, in that sense, automatically preserved regardless of whether a post-trial motion has been filed. *Enoch,* 122 Ill. 2d at 190.

For that reason, no purpose is served in analyzing whether a capital defendant's post-trial motion specifically sets out those limited types of errors. The point should be obvious. It would be illogical to hold any of those issues waived because they were not stated with specificity in a post-trial motion when such a motion was unnecessary to preserve those issues for review. Such a conclusion would be reached only by measuring the capital defendant's motion against the standards used in a noncapital case.

It seems to me that there would actually be a disincentive for a capital defendant to attempt to direct the trial judge, in a post-trial motion, to issues otherwise automatically preserved by objection in addition to

other complained-of errors. The capital defendant would risk having the court determine the otherwise automatically preserved issues waived for lack of specificity. Such a result would be contrary to the purpose of a post-trial motion. See *People v. Caballero* (1984), 102 Ill. 2d 23.

Defendant's argument here is that the failure to exclude Esly, Rogers, and Burdick for cause ostensibly deprived him of his constitutional right to a fair trial. Assuming a proper trial objection, that issue would be preserved regardless of the failure to file a post-trial motion or despite a nonspecific statement of that error in a filed motion. Nevertheless, the majority analyzes defendant's post-trial motion here in terms of its specificity, concluding that although the motion was "fairly general" it was "sufficient to alert the court" to the issue. 152 Ill. 2d at 168.

In characterizing the motion as "fairly general," but finding it sufficiently stated to avoid application of the waiver rule, I believe the majority may unintentionally create an impression that the specificity requirement is not seriously considered. That is not the case. Nothing in the majority opinion should be read as a departure from the requirement that post-trial motions must set out, in detail, the complained-of issue where such a motion is required to avoid waiver. Although, again, the consideration is unnecessary in this capital case, I would point out that defendant's motion did specifically identify the issue as the "failure to excuse various jurors for cause[,] forcing the defendant to exhaust his peremptory challenges."